DEMOS v. UNITED STATES.

No. 14340.

United States Court of Appeals Fifth Circuit.

June 26, 1953.

Rehearing Denied Aug. 6, 1953.

M. C. Gonzales, San Antonio, Tex., for appellant.

C. F. Herring, U. S. Atty., and Bradford F. Miller, Asst. U. S. Atty., San Antonio, Tex., for appellee.

Before HOLMES, BORAH and RIVES, Circuit Judges.

RIVES, Circuit Judge.

The appellant was indicted along with one Richard A. Najera for having sold heroin to Sam F. Stowers in violation of Title 26 U.S.C. § 2554(a) [1]. In Counts 2 and 3 of the same indictment, Richard A. Najera was indicted for two subsequent sales of heroin to Sam F. Stowers. Najera entered a plea of guilty to Counts 2 and 3, and both he and appellant stood trial under Count 1 of the indictment. The jury found both guilty as charged. Appellant's sentence, as a second offender, was the minimum five year term of imprisonment [26 U.S.C.A. § 2557(b) (1)] and a fine of $100.00.

For reversal appellant makes two insistences: (1) that the evidence was insufficient to sustain the verdict and judgment; and (2) that the undisputed evidence established the defense of entrapment.

Sam F. Stowers was a Government narcotic agent stationed at Dallas, Texas, and was sent "on this one job" to San Antonio in that capacity. He came with "a letter of introduction from a police character in Dallas" to an ex-convict named Frazier in

San Antonio. Frazier introduced him to Najera, and Najera testified:

"He (Frazier) was with us for about two or three days first, when he first got that heroin for him, because I told him that I was scared of him, I didn't know him, or anything like that, and he said, 'Well, I will get some for him, so that you will know that he is all right,' and then he got some for him * * *."

Najera further testified that thereafter he had sold heroin to Stowers on two occasions prior to the time laid in Count 1 of the indictment.

Stowers was the only witness introduced on behalf of the Government. He testified that he had heard that the appellant operated as a "fence", taking stolen groceries for sale on the black market, and he sought to gain her confidence by apparently engaging in that illicit trade. He purchased some groceries and meat for which he paid $57.41; and with two boxes on the back seat of his automobile containing his purchases, he drove to the appellant's house and parked his car. Immediately, apparently by coincidence, Najera drove up by the side of his car and asked him what he was doing there. He told Najera that he had a load of groceries in the back seat of the car that he had to get rid of. He walked on ahead of Najera to appellant's house, knocked on the door, introduced himself to the appellant as Jesse Thomas, and stated that he had a load of groceries and wanted someone to help carry them in the house. Najera and the appellant had a conversation in Spanish and Najera and Stowers walked to the automobile, picked up the two boxes of groceries, and carried them into the house, where their values were tabulated and the appellant paid Stowers $25.00 or approximately one-half price for the groceries. What then occurred is best told in the language of the witness, which we have quoted in the margin [2].

1. Title 26 U.S.C. § 2254(a) reads as follows:

"(a) *General requirement.* It shall be unlawful for any person to sell, barter, exchange, or give away any of the drugs mentioned in section 2550(a) except in pursuance of a written order of the person to whom such article is sold,

bartered, exchanged, or given, on a form to be issued in blank for that purpose by the Secretary."

2. "Q. She was paying you half-price for the groceries? A. Half price, that is right. I then told Mrs. Demos I had some business that I would like to talk to

Stowers thereafter made repeated efforts to purchase heroin from the appellant, but each time without success, "She always left it hanging in the balance, so to speak". On one occasion he offered her $90.00 for her to deliver to him three grams of heroin. She refused but told him that she would contact Najera and try to have him deliver the heroin.

The appellant did not testify in her own behalf and the court properly charged the jury that such was her privilege, and that her failure to testify should not be considered as any evidence of guilt. Najera testified admitting that he was an addict to heroin and was guilty of making a number of sales to Stowers, denying that he made the sale charged in Count 1 of the indictment or that the appellant had any connection with any of the sales. He testified that, when Stowers brought the supposedly stolen groceries, he happened to be at the appellant's home in the performance of some carpenter repair work for the appellant. He lived on the opposite side of San Antonio from appellant. The appellant was a half sister of Najera's wife.

 There was no motion for a directed verdict on the ground of the insufficiency of the evidence. The appellant's counsel

her about, and would she come with me to the front room, and we then left the kitchen and went into the front room of the house, and I then told Mrs. Demos that I had just come into town from Dallas, and that I had about two thousand dollars, that I had just made a good store in Dallas, and I had my wife working for me; in other words, I told her that my wife had stolen the groceries, and I told her that even though I had all this money, I was not going to throw it away, and I was going to work immediately in San Antonio.

"Q. You all talked about stealing groceries, is that right? A. Yes, sir. And I then told Mrs. Demos that my wife was hooked on stuff.

"Q. And what did you mean by that? A. Heroin, morphine or dilaudid.

"Q. A dope addict, in other words? A. Yes, narcotics, and that I had to have quite a bit of it to keep her working; in other words she would get sick if she didn't get it, and at that time I didn't need the money, but I did need some stuff—some narcotics, and I also told her that I thought I was going to try to get rid of my wife, because she was trying to get me hooked on the stuff myself * * *.

* * * * *

"Mr. Herring:
"You told her that you didn't want to get hooked on the stuff yourself, and what did she say then? A. She said, 'That's smart; it is bad to get to fooling with it,' and then I told her that I was down here from Dallas, that there was a pick-up on me up there, and I gave her the license number of the car that I was driving, and asked her to check around to see if the police were—if they knew I was in San Antonio, or were looking for the car.

"Q. By pick up, you meant that there was a warrant out for you up there at that time? A. Yes, sir, and we then left the living room and went into the dining room, which was located between the living room and the kitchen, and I wrote down that license number for her on a sheet of paper—I believe it was on a white envelope, and we then returned to the front room, and I then told Mrs. Demos that should I get picked up by the police in San Antonio, I would have to be released in a hurry before they found out that there was a pick-up on me in Dallas, Texas, and she then told me that if I ever got picked up—my wife and I—, that she—

* * * * *

"She told me to call her immediately, and gave me a telephone number at which to reach her, and that number was G-5417—I believe, but I am not sure about that number—and I then asked Mrs. Demos, I said, 'How much does one gram of the stuff sell for, thirty or thirty-five dollars?" and she replied, 'That's right,' and I said 'I would appreciate it very much if you would help me out on obtaining some stuff,' and she said 'Go out on the front porch and wait, and I will call Kios.'

"Mr. Herring:
"Q. Who is Kios? A. The defendant Najera, and I then walked out on the front porch and was joined almost immediately by him, and he said, 'How much was it you wanted?' and I said, 'One gram,' and he then told me to drive around the block and to park by the railroad track; that was at the corner of Rogers and Crosby Streets, and about one minute after I arrived, he walked up to the car, and handed me two small cellophane packages, for which I paid him thirty dollars, and then I left the vicinity."

recognizes the validity of the rule that, in the present state of the record, the evidence will be reviewed by this Court only to prevent a manifest miscarriage of justice. Thomas v. United States, 5 Cir., 189 F.2d 430. By that test, in our opinion, the evidence was clearly sufficient to sustain the appellant's conviction.

The appellant did move the court to instruct the jury to return a verdict of not guilty on her behalf, "on the grounds that the undisputed evidence shows a careful and deliberate planned entrapment of said defendant". The court denied that motion but orally charged the jury as to the defense of entrapment as set out in the margin [3].

█ The opinion of the Supreme Court in Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, is the controlling authority in the federal courts on the defense of entrapment. Among other authorities, that opinion refers to the leading case of Butts v. United States, 8 Cir., 273 F. 35, 18 A.L.R. 143, opinion by Circuit Judge Sanborn, and to the decision of this Circuit in Gargano v. United States, 24 F. 2d 625, opinion by Circuit Judge Bryan. The defense is permitted upon the theory that, though the acts of the defendant come within the letter of the statute, they may be foreign to its purpose. "Fundamentally, the question is whether the defense, if the facts bear it out, takes the case out of the purview of the statute because it cannot be supposed that the Congress intended that the letter of its enactment should be used to support such a gross perversion of its purpose." Sorrells v. United States, supra, 287 U.S. at page 452, 53 S.Ct. at page 216.

The controlling question was stated to be "whether the defendant is a person otherwise innocent whom the government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials." Id. 287 U.S. at page 451, 53 S.Ct. at page 216. The opinion carefully draws attention that,

" * * * the defense of entrapment is not simply that the particular act was committed at the instance of government officials. That is often the case where the proper action of these officials leads to the revelation of criminal enterprises. Grimm v. United States, supra [156 U.S. 604, 610, 15 S. Ct. 470, 39 L.Ed. 550]. The predisposition and criminal design of the defendant are relevant." Id. 287 U.S. at page 451, 53 S.Ct. at page 216.

In the case from this Circuit, Gargano v. United States, supra, 24 F.2d at page 625, it was well said that, " * * * the test was whether the offense originated in the mind of the accused, or in the mind of the official * * *." For the offense to originate in the mind of the defendant, it was not necessary that the defendant be the instigator of the particular sale or act, but only that she have the general intention to commit such an offense whenever the opportunity offered.

█ While the appellant's former conviction would have been admissible before the jury when it appeared that she was relying on the defense of entrapment, see Carlton v. United States, 9 Cir., 198 F.2d 795, it was not actually brought forth until the pre-sentence hearing. Nor did the Gov-

3. "If you are satisfied that prior to the commission of the acts alleged to constitute the crime, that the defendant Adelaida Lita Demos never conceived any intention of committing the offense, but that the officers of the Government incited and by persuasion and representations lured her to commit the offense alleged in order to entrap, arrest, and prosecute her therefor, then these facts are fatal to the prosecution and the defendant Adelaida Lita Demos is entitled to a verdict of not guilty.

"When it is suspected that a crime is being committed and the question is as to who the guilty persons are, traps may be laid and baited in order to catch the guilty person. A suspected person may be tested by being offered opportunity to transgress in such manner as is usual therein. The question is not one of laying a trap or of trickiness or deceit which is permissible in order to detect a person in the commission of crime, but is one of seduction or improper inducement to commit the crime. In other words, the officers or informers may give the defendant an opportunity to violate the law, but they cannot by persuasion or inducement cause him to commit a crime which he would not otherwise have committed and thereafter successfully prosecute him."

**600**

ernment produce evidence before the jury to show its grounds for suspecting that the appellant was engaged in the illicit traffic in drugs, or to show her pre-disposition to commit the offense. The jury were authorized, however, to consider the appellant's willingness to commit the crime as evidenced by her ready compliance with the agent's request [4]. The evidence in this case on the issue of entrapment does not seem to us nearly so strong for the defendant as was the evidence recited in Sorrells v. United States, supra, and yet in that case the extent of the holding of the Supreme Court was "that the trial court was in error in holding that as a matter of law there was no entrapment and in refusing to submit the issue to the jury." Sorrells v. United States, supra, 287 U.S. at page 452, 53 S.Ct. at page 216. See also Hunter v. United States, 5 Cir., 62 F.2d 217; Weathers v. United States, 5 Cir., 117 F.2d 585. In the instant case the District Court submitted the issue to the jury in a charge (Footnote 3, supra) to which appellant's counsel stated that he had no objections. It appearing that there is no error in the record, the judgment is,

Affirmed.

---

4. See full opinion of Judge Learned Hand in United States v. Sherman, 2 Cir., 200 F.2d 880 & 882.