STATE of Iowa, Appellee,

v.

Franklin Wayne LYONS, Appellant.

No. 55630.

Supreme Court of Iowa.

Sept. 19, 1973.

Polk County-Des Moines Offender Advocate Office, Anthony M. Critelli, Chief Atty., Des Moines, for appellant.

Richard C. Turner, Atty. Gen., Thomas D. McGrane, Asst. Atty. Gen., and Ray Fenton, Polk County Atty., for appellee.

Heard by MOORE, C. J., and MASON, REES, REYNOLDSON and HARRIS, JJ.

REES, Justice.

Defendant was convicted of robbery with aggravation, was sentenced, and appeals. We affirm.

Mrs. Judith Thornton testified that on the morning of January 7, 1972, she received several phone calls, but that when she answered the telephone the caller hung up. At 9:30, shortly after the last phone call, she answered the doorbell at her home and had barely opened the door when an intruder forced it open and gained admittance.

Mrs. Thornton testified the intruder then pulled a gun from his belt, took off his hat and removed from it a nylon stocking which he pulled over his head, but that in attempting to do so the stocking ripped, leaving a five- or six-inch space on the right side of the intruder's face which permitted Mrs. Thornton to effectively observe his facial characteristics. The intruder then told Mrs. Thornton he wanted money and jewelry, and she gave him $10, a wedding and engagement ring soldered together, and a diamond pendent which he removed from its chain and put into his pocket. He then asked her about a ring she was wearing on her finger, but she told him it was a keepsake made from her grandfather's cufflinks and asked him to permit her to keep it, in which he acquiesced. The intruder then told Mrs. Thornton he wanted her to engage in sexual intercourse with him, but she was able to dissuade him from his intentions in this regard, whereupon he directed her to go to the downstairs of her home and as she passed him he grabbed her left breast. Mrs. Thornton further testified as to certain directions the robber then gave to her, and that he informed Mrs. Thornton her husband's life was in danger if she did not follow the instructions implicitly. He then left via the front door of the home, and after an interval of about ten minutes Mrs. Thornton contacted her husband and her mother-in-law. The police were then called, and an investigation ensued.

On the same date Mrs. Thornton spent most of the afternoon at the police station looking at photographs of potential suspects, but she was unable to identify the intruder in her home from any of the photos. Subsequently, on February 4, 1972, two detectives brought a collection of ten photographs to the Thornton home for inspection by Mrs. Thornton, and she immediately identified defendant from the second photograph which was offered to her for inspection.

Some days later Mrs. Thornton was asked to come to police headquarters for the purpose of viewing an audio-video tape which depicted several men, including the defendant; the tape having been made for the purpose of voice and visual identification. Once again Mrs. Thornton identified the defendant as one of the persons shown on the video tape. Later, at trial, defense

counsel objected to the admission of the evidence of the video tape or any reference to it for the reason that the tape was not taken while defendant had counsel present, and had signed no waiver relative to a submission to any kind of a lineup.

Prior to trial, defendant's counsel filed a motion for discovery and production of evidence, requesting among other things: (a) a copy of the photograph or "mugshot" which was exhibited to the witness Judith Thornton; (b) that defendant be afforded an opportunity to view and listen to the sound-on-film tape which was taken of the person and voice of defendant and two other individuals and which was exhibited to the witness Thornton; (c) a copy of the photograph or "mugshot" of the two other persons whose voices and pictures were reproduced on the audio-visual film that was exhibited to the witness Thornton; and (d) a copy of any statement or statements given to members of the police department, or of the county attorney's staff by the witnesses Judith Thornton or Elizabeth Hermann.

Hearing was had on defendant's motion for discovery and production of evidence, and the court permitted discovery of the photographs and the audio-visual film, but overruled the motion insofar as it applied to any statement or statements given to the police department or county attorney's staff by Mrs. Thornton or Mrs. Hermann. In such ruling, the court found that there were no written statements by Mrs. Thornton which had been given to the police department or the county attorney's staff.

The cause proceeded to trial, resulting in a verdict of guilty, and defendant was sentenced. He filed a motion for new trial, which was overruled.

Defendant urges as grounds for reversal the following:

(1) Trial court erred in failing to limit or strike certain testimony as to certain remarks and conduct on the part of defendant which occurred during the course of the robbery.

(2) Trial court erred in refusing to allow discovery by the defendant of police investigatory reports containing the victim's description of the robber.

(3) That certain conduct of the prosecuting attorney and comments in his argument to the jury denied defendant a fair trial.

(4) That identification procedures employed by the police in video-taping defendant were so indecisive and suggestive of mistaken identity as to deny the defendant a fair trial and violate his constitutional right of due process.

I. In his first error assigned, defendant contends trial court erred in failing to exclude testimony having to do with statements made by him during the course of the robbery and his actions and conduct at the same time. Specifically, defendant contends the testimony of Mrs. Thornton, who testified that her assailant told her he had a wife and two children he had not seen in several years and the further reference by Mrs. Thornton of the fact defendant requested her to engage in sexual intercourse with him, was inadmissible. Defendant contends such testimony would only serve to arouse the passions of the jury, and that it is immaterial to the crime charged.

■■ With reference particularly to defendant's statements concerning his wife and children, we perceive no error in the court's ruling permitting its admission. A general statement of the law in this regard is found at 22A C.J.S. Criminal Law § 669, p. 686:

"Statements and conduct of accused at the time of the commission of the offense are part of the transaction itself and may be admissible as *res gestae,* although they may have a tendency to inflame the minds of the jury, * * *."

See also 29 Am.Jur.2d, Evidence, § 713, p. 775, at which we find:

"It is well settled that the term '*res gestae*' includes all those acts and circumstances which are incidents of a particular litigated act * * *."

The mere fact that some of the testimony is not directly relevant to the elements of the crime charged should not, and does not, render it inadmissible, for if nothing more it is beneficial to accurately describe what actually happened at the time of the commission of the claimed offense.

The Texas Court of Criminal Appeals, in Hagood v. State (1927), 106 Tex.Cr.R. 450, 292 S.W. 904, held that testimony of a prosecutrix in a rape case to the effect that just prior to the alleged rape she informed the defendant she did not want to engage in intercourse with him and that he then said, "Oh, come on; I have been married and I know everything." was clearly admissible. See 62 A.L.R.2d 1078, § 8. The Texas court went on to say that although the statement referred to the fact that the defendant had previously been married it was relevant as a part of the transaction. We feel that the court's ruling permitting Mrs. Thornton to testify as to statements made by defendant that he had been previously married was not error.

■ Nor do we feel the court's ruling on objections to the admission of evidence concerning defendant's request for sexual relations is inadmissible, although it should probably be subjected to closer scrutiny.

This court recently, in State v. Fetters, 202 N.W.2d 84, 91 (Iowa 1972), held evidence of the commission of crimes other than the one with which defendant is presently charged is inadmissible. This general rule is subject however to certain exceptions, as noted in 1 Wigmore, § 218, p. 719:

"There is, however, an additional class of cases in which the misconduct of a defendant may be received, irrespective of any bearing on character, and yet not as evidential of one of the above matters (design, motive, or the like), or as relevant to any particular subsidiary proposition. That class includes other criminal acts which are an inseparable part of the whole deed."

Succinctly stated, the question appears to be whether the acts and statements of the defendant are integral parts of the crime with which he is charged, or whether they are unrelated in time and space, and to the parties involved. In State v. Holoubek, 246 Iowa 109, 113, 66 N.W.2d 861, 863 (1954), this court said:

"The rule in such cases appears to be that where the acts are all so closely related in point of time and place, and so intimately associated with each other that they form a continuous transaction, the whole transaction may be shown, * * *."

As noted in Wigmore, *supra,* at 722, although the notion is quite similar to *res gestae,* legal authorities are not quite satisfied with this characterization and says:

"Let it be said that such acts [are] receivable as 'necessary parts of the proof of an entire deed' or 'inseparable elements of the deed', or 'concomitant parts of the criminal act', or anything else that carries its own reasoning and definition with it. * * *."

A long line of Iowa cases have embraced this rationale. See State v. Dunne, 234 Iowa 1185, 15 N.W.2d 296 (1944) (assault with intent to commit murder; evidence admitted showing theft of revolver); State v. Rand, 238 Iowa 250, 25 N.W.2d 800 (1947) (prosecution for keeping a gambling house; testimony as to sale of whiskey admitted); State v. Hill, 239 Iowa 675, 32 N.W.2d 398 (1948) (reckless driving; evidence admitted as to defendant's conduct in driving car prior to collision); State v. Holoubek, *supra,* (prosecution for rape; testimony admitted as to alleged rape of prosecuting witness by a third par-

ty immediately following the alleged rape); State v. Galvan, 181 N.W.2d 147 (Iowa 1970) (prosecution for murder; testimony admitted with regard to earlier altercation). Trial court committed no error in overruling defendant's objections as to the statements and conduct of defendant at the time of the commission of the robbery.

II. Defendant next asserts it was error for trial court to refuse defendant access to certain police reports containing the statements of the victim, Mrs. Thornton. Defendant contends the statement should have been available to him as Mrs. Thornton was the only witness who could identify defendant as her assailant, and it was necessary to a proper defense to see her initial description of the assailant.

It must be remembered that Mrs. Thornton made no statement which she actually signed, nor signed one reduced to writing by anyone else which she adopted, and no verbatim rendition is claimed to have been made of her statements to the police. Nor does defendant in this case claim he was entitled to access to the police report because it was exculpatory in nature.

■ We need not belabor this proposition as we have very recently given attention to it in State v. Richard Wallace Houston, 209 N.W.2d 42 (opinion filed July 2, 1973). In short, we conclude trial court did not err in refusing to afford defendant access to the police report. Reference is made to State v. Houston, *supra,* and cases therein cited.

III. Defendant next contends the prosecuting attorney interjected into his argument to the jury references to matters that had been excluded by the court, and also made reference in argument to matter not of record and based solely on the personal observation of the prosecuting attorney, and that such conduct on the part of the prosecuting attorney was improper and prejudicial and denied defendant a fair trial.

In his argument to the jury, the prosecuting attorney made reference to the viewing of the video tape by Mrs. Thornton and said, "That they went all the way through and started on the next one and she asked to have it read back or run again, because she wanted to see if any of the facts that he said on that tape were the same that he said at the house. I think you could conclude it was." Defendant asserts this was improper argument for the reason that objection was lodged to the testimony of Mrs. Thornton as to what she viewed and heard on the audio-video tape and that the objection was sustained. We do not read the record as supportive of defendant's contention in this regard. Mrs. Thornton was asked by the prosecutor:

"Q. Now, after Mr. Lyons went through what happened, or after he was on?

"A. Then there was a man that came on after him. The name I can't remember and I asked to see Mr. Lyons again, because I was interested in whether anything he had told me that day that he was in my home coincided with what he said on the videotape.

"Q. Did it?

"A. Yes, sir. He did say that he had a wife and that he hadn't seen her; that he was divorced, and he had one or two children."

Mrs. Thornton was then asked by the prosecutor:

"Q. Did he say when he was divorced?

"A. I can't remember whether he did or not, but then it went—."

Objection was then made by defense counsel as follows:

"MR. CRITELLI: Your Honor, I would object to that portion of the testimony relative to what was said on the

content of that tape for the reasons I have indicated before relative to the fact that this tape was not taken while the defendant had counsel present, and there was no waiver signed by him relative to a submission to any kind of a line-up of any kind.

"THE COURT: I will sustain that objection.

"MR. CRITELLI: I ask the answer be stricken from the record.

"THE COURT: It may be stricken from the record."

■ Obviously, the objection by defendant's counsel was directed only to the last question. No record was preserved as to the line of questioning first above set out and the answers made thereto. We feel the statements of counsel in argument as to what Mrs. Thornton had to say with regard to her viewing and listening to the audio-video tape was fair argument in all respects.

Further, defendant objects to the following statement made by the prosecuting attorney in rebuttal argument:

"Also in reply to evidence that they were not stolen from the Thornton home, besides watches and rings, and this goes to identification, you know you can see in a trial as well as hear. Recross examination, if any of you saw it, Mr. Lyons whispered to Mr. Critelli. Mr. Critelli then asked Mrs. Thornton, 'I see this ring on your hand; did he ask for that? Did he take that?' and she said, 'No. I had it on my hand and he asked for it and I told him it was a keepsake cufflink and if I could keep it.'

"Just think of that. Just think of how it came out. It was never mentioned on direct examination. I didn't bring that out. Why? He didn't take it, but after the conversation from the Defendant to Mr. Critelli he asked about it. I didn't bring that out. The defense counsel, the defense did."

■ A reading of the record indicates to us that this also was fair argument as counsel for the defendant introduced the subject of the cufflink-ring in cross examination of Mrs. Thornton.

The record indicates counsel for defendant moved for a mistrial, based on the claimed misconduct of State's counsel in argument in the particulars above recited, and that the motion was overruled.

■ Two basic principles must govern our review of the record made in these particulars: 1) we must determine whether or not the claimed improper argument so prejudiced the defendant that he was denied a fair trial; and 2) we must be mindful that substantial discretion lies with the trial court in deciding such a question. In the recent case of State v. Vickroy, 205 N.W.2d 748 (Iowa 1973), these principles were alluded to by this court, at pp. 750–751 of the cited case:

"It is to be inceptionally understood, trial courts are vested with considerable discretion in determining whether prejudice results from trial misconduct on the part of a prosecutor (citations).

"That discretion is not, however, without limitations. It must be utilized fairly and impartially, not arbitrarily, by application of relevant, legal and equitable principles to all known or readily available facts of a given issue or cause to the end that justice may more nearly be effectuated."

In *Vickroy*, this court determined the prosecutor's actions constituted misconduct, and that defendant's motions for a mistrial and for instructions to the jury to disregard were improperly overruled. In *Vickroy*, the prosecutor had made an obvious attempt to influence a jury by professional statements. We are unable to perceive a like situation in the matter before us.

■ In State v. Hephner, 161 N.W.2d 714, 721 (Iowa 1968), this court said, quot-

ing from State v. Harless, 249 Iowa 530, 536, 86 N.W.2d 210, 213–214 (1957):

"We have held repeatedly that misconduct of the prosecuting attorney in argument does not require granting a new trial unless it appears to have been so prejudicial as to deprive defendant of a fair trial * * *.

"We have also frequently pointed out that the trial court is in much better position than we are to judge whether claimed misconduct of counsel is so prejudicial as amounts to denial of a fair trial. Considerable discretion is allowed the trial court in passing on such a matter and we will not interfere with its determination unless it clearly appears there has been a manifest abuse of such discretion. * * *"

We cannot find manifest abuse of the court's discretion in this case. We conclude the argument of the prosecutor did not serve to deprive defendant here of a fair and impartial trial.

■ IV. Finally, defendant contends the procedure employed by the police in video-taping the unrepresented defendant for an excessive period of time in comparison to others taped, and requiring defendant to speak words similar to those allegedly spoken by victim's assailant and inclusion of a black person on tape viewed when nothing would indicate assailant was black, were all highly suggestive and inducive to mistaken identity and were violations of defendant's rights to due process of law.

Defendant fails to present argument with respect to the first portion of the error assigned, that is to say, with respect to the impropriety of the procedure employed by the police in video-taping the defendant. In his argument on the error so assigned, he confines himself to any improprieties which may have occurred in permitting Mrs. Thornton to view the video-tape. Defendant equates Mrs. Thornton's viewing of the audio-visual tape to a police lineup. We are not prepared to agree that there is any parallel between the taping procedures and the lineup or showup in a police setting.

His indication, or intimation, that the video-tape reproduction of defendant and the audio portion reproducing his voice are inducive of mistaken identity, we believe under the factual situation here, is without any substantial merit. The record indicates that Mrs. Thornton had made a positive identification of defendant before viewing the video-tape, and positively identified him during the viewing of the video-tape, and thereafter. She testified she had an opportunity to view the tape twice, and nothing on it tended to shake her conviction that the individual who was depicted thereon was the same person as the defendant and the one who robbed her on January 7th. Certain questions were asked the defendant at the time of the video-taping relative to his personal history, and a portion of his answers coincided with statements made to Mrs. Thornton at the time of the robbery.

Moreover, the chronology of this case is important; the robbery occurred on January 7, 1972. About a month after the robbery Mrs. Thornton identified defendant as her assailant from a group of photos or mugshots, and approximately one week later she went to the police station where she viewed the audio-video tape of defendant taken by the police identification bureau. Therefore her positive identification of the defendant, both from the photos and from the audio-video tape, were prior to the filing of the indictment on March 16, 1972. We mention this chronological sequence of events specifically as defendant has cited the case of Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411. In *Kirby*, the Supreme Court of the United States said, at page 1882 of 92 S.Ct.:

"In this case we are asked to import into a routine police investigation an absolute constitutional guarantee historically and rationally applicable only after the onset of formal prosecutorial pro-

ceedings. We decline to do so. Less than a year after *Wade* (U.S. v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149) and *Gilbert* (Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178) were decided, the Court explained the rule of those decisions as follows: 'The rationale of those cases was that an accused is entitled to counsel at any "critical stage of the *prosecution*", and that a post-indictment lineup is such a "critical stage".' (citations) We decline to depart from that rationale today by imposing a *per se* exclusionary rule upon testimony concerning an identification that took place long before the commencement of any prosecution whatever."

See also United States v. Ash, —— U.S. ——, 93 S.Ct. 2568, 37 L.Ed.2d 619 (decided June 21, 1973).

We see no merit in this assignment of error.

On the entire record, we find no error, and accordingly this case is affirmed.

Affirmed.