STATE of Iowa, Appellee,

v.

Jerry·Patrick MULLEN, Appellant.

No. 55519.

Supreme Court of Iowa.

March 27, 1974.

John W. Hayek, Iowa City, for appellant.

Richard C. Turner, Atty. Gen., Dennis E. Jontz, Asst. Atty. Gen., Carl Goetz, County Atty., Robert L. Stenander, Asst. County Atty., for appellee.

REYNOLDSON, Justice.

Upon trial defendant was found guilty of delivering marijuana, a controlled substance. He was sentenced to serve a term in the penitentiary not exceeding five years and to pay a fine of $500. Upon his appeal to this court, we reverse.

July 27, 1971, Keenley, a state undercover agent, sent Linda Archibald (a "cooperating individual" working with the Department of Public Safety) into the Vine Tavern at Iowa City to contact defendant for the purchase of hashish or marijuana. She returned to Keenley's vehicle with defendant, who sold the agent three ounces of hashish for $255.

Defendant, testifying, said he was told by Miss Archibald "that if I didn't help them they would have to go back to their hometown empty-handed and that they had a bunch of people lined up to buy grams of hash and things like that." Defendant contended, "I didn't want to be a 'jerk' * * * and flat out refuse to help them." He testified he then obtained the hashish from a friend in the tavern and sold it only because he was persuaded by Miss Archibald.

Upon cross-examination defendant said he had lived with three other college students at 730 Iowa Avenue. He was asked if Keenley and Miss Archibald had not come to that residence on prior occasions to buy drugs. Objection to the question was overruled and defendant stated he could not say that was a fact. He was then asked if he was in that residence and witnessed Mr. McGranahan sell hashish to Keenley. (See State v. McGranahan, 206 N.W.2d 88 (Iowa 1973)). Objection to this question was sustained.

There immediately followed an inquiry, "Is it not a fact, sir, that prior to July 27, 1971, that you had sold or delivered marijuana to Mr. Keenley?" The objection being overruled, defendant responded that to the best of his knowledge, he had not. Two more such questions followed, with similar responses.

The defendant then rested. In the jury's absence defense counsel made a motion in limine to exclude any testimony by state agents Keenley and Dooley relating to alleged prior sales of marijuana and specifically an alleged sale made April 22, 1971, on the ground such testimony would be irrelevant, prejudicial, deprive defendant of a fair trial, and the alleged incidents were remote in time. The county attorney con-

firmed he intended to call those witnesses to testify concerning that sale. Trial court, inquiring of counsel, ascertained defendant had been arraigned on the alleged April 22, 1971 offense. The court then ruled:

"Now you go down and get that file, and we can put the Defendant on the stand, and you can impeach him by asking him if he was not arraigned on that charge. But that's as far as I am going to go. I will sustain your motion. He can refresh his recollection."

At the court's suggestion the State moved to reopen to further cross-examine the defendant. All this was over the vigorous objections of defendant's counsel, on the above grounds and the additional grounds the procedure would be improper cross-examination and deprive defendant of due process and fair trial. These objections were overruled.

Defendant was recalled for the cross-examination. Over similar objections, which were again overruled, he was asked if he had been arraigned on a charge of selling marijuana to Keenley on April 22, 1971, which he admitted, and if he wished to change his prior testimony as to whether he had previously sold marijuana to Keenley, to which he responded in the negative.

Motion for mistrial was overruled. Following conviction, defendant's motion for new trial, raising the same issues, was overruled.

Appealing, defendant asserts trial court erred in permitting him to be cross-examined, over proper objection, concerning alleged previous criminal offenses unrelated to the offense for which he was being tried. He further contends even if that evidence was admissible, trial court erred in directing and permitting him to be cross-examined concerning an arraignment on a separate charge because evidence of arraignment would not be competent or relevant evidence to prove commission of the separate offense.

I. It is clear defendant could not be impeached in such fashion and this case must be reversed on defendant's second ground of assigned error. Section 622.17, The Code; State v. Underwood, 248 Iowa 443, 447–448, 80 N.W.2d 730, 733–734 (1957); State v. Voelpel, 213 Iowa 702, 707, 239 N.W. 677, 679 (1931).

II. It is equally clear the State upon retrial will contend evidence of alleged prior offenses is admissible because defendant has raised the defense of entrapment. Here the State's brief attempts to justify what occurred below on the theory such evidence would bear on defendant's "predisposition" to commit the alleged crime. We believe that issue should be resolved while the case is now before us. The parties apparently concede, and we agree, this is a matter of first impression in this court.

The entrapment defense was first recognized and sustained by the United States Supreme Court in Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). Of primary significance here, the Sorrells majority held, "The predisposition and criminal design of the defendant are relevant. [T]he issues raised and the evidence adduced must be pertinent to the controlling question whether the defendant is a person otherwise innocent * * *." Mr. Justice Roberts, in a separate opinion concurred in by Justices Brandeis and Stone, asserted the question was one for the court to determine based upon the nature of the law officers' conduct and not upon the fact the defendant had a bad reputation or had a history of previous transgressions.

"It is the province of the court and of the court alone to protect itself and the government from such prostitution of the criminal law."—287 U.S. at 457, 53 S.Ct. at 218, 77 L.Ed. at 425.

The Sorrells entrapment test, focusing on the intent or predisposition of the defendant to commit the crime, again withstood assault in 1958, although the reason-

ing of Mr. Justice Roberts found expression in a concurring opinion written by Mr. Justice Frankfurter in which Justices Douglas, Harlan and Brennan joined. Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).

Evidencing a reluctance to overturn a long-standing precedent, the United States Supreme Court, again by a five to four majority, reaffirmed the *Sorrells* rule in United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). The conflict between the competing rationales and the considerations to be weighed are well defined by Mr. Justice Stewart's dissent, 411 U.S. at 440–443, 93 S.Ct. at 1647–1648, 36 L.Ed.2d at 378–380:

"In Sorrells v. United States * * * the Court took what might be called a 'subjective' approach to the defense of entrapment. In that view, the defense is predicated on an unexpressed intent of Congress to exclude from its criminal statutes the prosecution and conviction of persons, 'otherwise innocent,' who have been lured to the commission of the prohibited act through the Government's instigation. * * *

Thus, the subjective approach focuses on the conduct and propensities of the particular defendant in each individual case: if he is 'otherwise innocent,' he may avail himself of the defense; but if he had the 'predisposition' to commit the crime, or if the 'criminal design' originated with him, then—regardless of the nature and extend of the Government's participation—there has been no entrapment. * * * And, in the absence of a conclusive showing one way or the other, the question of the defendant's 'predisposition' to the crime is a question of fact for the jury. * * *

"The concurring opinion of Mr. Justice Roberts, joined by Justices Brandeis and Stone, in the Sorrells case, and that of Mr. Justice Frankfurter, joined by Justices Douglas, Harlan, and Brennan,

in the Sherman case, took a different view of the entrapment defense. In their concept, the defense is not grounded on some unexpressed intent of Congress to exclude from punishment under its statutes those otherwise innocent persons tempted into crime by the Government, but rather on the belief that 'the methods employed on behalf of the government to bring about conviction cannot be countenanced.' Sherman v. United States, supra, 356 U.S. at 380, 78 S. Ct. at 324, 2 L.Ed.2d 848. Thus, the focus of this approach is not on the propensities and predisposition of a specific defendant, but on 'whether the police conduct revealed in the particular case falls below the standards, to which common feelings respond, for the proper use of governmental power.' Id., at 382, 78 S.Ct. 825, 2 L.Ed.2d 848. * * * Under this approach, the determination of the lawfulness of the Government's conduct must be made—as it is on all questions involving the legality of law enforcement methods—by the trial judge, not the jury.

* * * * * *

"Furthermore, to say that such a defendant is 'otherwise innocent' or not 'predisposed' to commit the crime is misleading, at best. The very fact that he has committed an act that Congress has determined to be illegal demonstrates conclusively that he is not innocent of the offense. * * * That he was induced, provoked, or tempted to do so by government agents does not make him any more innocent or any less predisposed than he would be if he had been induced, provoked, or tempted by a private person—which, of course, would not entitle him to cry 'entrapment.' Since the only difference between these situations is the identity of the temptor, it follows that the significant focus must be on the conduct of the government agents, and not on the predisposition of the defendant. * * *

\* \* \* \* \* \*

"Moreover, a test that makes the entrapment defense depend on whether the defendant had the requisite predisposition permits the introduction into evidence of all kinds of hearsay, suspicion, and rumor—all of which would be inadmissible in any other context—in order to prove the defendant's predisposition. \* \* \* This sort of evidence is not only unreliable, as the hearsay rule recognizes; but it is also highly prejudicial \* \* \*."

The issue of the admissibility of the testimony introduced in the case *sub judice* is inexorably intertwined with the subjective-objective test conflict. We confine our attention first to the usual treatment of this sort of testimony under our rules of evidence.

Thus limited, at the threshold we note our general principle that evidence to show the commission of crimes other than the one with which a defendant stands charged is inadmissible. State v. Wright, 191 N. W.2d 638, 639 (Iowa 1971). *Wright* and other decisions recognize exceptions which permit reception of evidence of other crimes to prove (1) motive, (2) intent, (3) absence of mistake or accident, (4) a common scheme or system of criminal activity embracing the commission of two or more crimes so related that proof of one tends to prove the other, or (5) identity of the person charged with the commission of the crime. See, e. g., State v. Armstrong, 183 N.W.2d 205, 207 (Iowa 1971).

While superficially it might appear such testimony as was introduced and attempted to be adduced in this instance would fall within the "intent" exception, an examination of our cases negates such conclusion. Thus in State v. Yarham, 206 Iowa 833, 840, 221 N.W. 493, 496 (1928), the Iowa court said:

"It may further be noted that the testimony of Mrs. Birke does not come within the rule governing similar transactions for the purpose of showing the intent of the defendant. \* \* \* Proof of similar transactions involving crime must be clearly shown. Mere suspicion is not enough. The evidence must be such that there can be no room for speculation in the minds of the jury whether the similar crimes attempted to be shown were actually committed or not."

We reaffirmed the *Yarham* rule in State v. Armstrong, supra, 183 N.W.2d at 208. In State v. Wright, supra, 191 N.W.2d at 641, we said, "It is not enough that the defendant committed other crimes of the same nature unless in some way each has a bearing on the other." In no other situation have we condoned admission of testimony similar to that in issue here.

Against that backdrop, we nonetheless must determine whether it should be admissible to show this defendant's "predisposition" to commit the offense with which he is charged.

It should be observed II Uniform Jury Instructions, Iowa State Bar Ass'n, No. 501.21 "Entrapment," provides in part:

"Entrapment means that the idea of committing the crime originated with the law enforcement officers or their agents, rather than with the defendant; *that the defendant had no previous disposition or intention to violate the law,* and that they urged and induced defendant to commit the crime charged." (Emphasis added.)

Plainly, under the language underlined, the above described examination of this defendant in the course of trial would be legitimate inquiry.

Supporting cases annotated under the above instruction by the Iowa State Bar Association Committee are State v. Heeron, 208 Iowa 1151, 226 N.W. 30 (1929) and State v. Taylor, 260 Iowa 634, 144 N. W.2d 289 (1966). Both cases recognized the defense of entrapment. In neither case did this court state defendant's "predisposition" or "previous disposition" was a material issue. In fact, the *Heeron* court

grounded its rationale on estoppel (because of the law officers' conduct), not that test the United States Supreme Court later adopted in *Sorrells*.

While we generally approved the uniform instruction in State v. Fagan, 190 N.W.2d 800, 802 (Iowa 1971), the sentence above underlined and related sentences employing the same language were not in issue. Unlike the *Russell* court, we are therefore free to seek that rule which will balance and recognize both the necessity to preserve the integrity of our courts and the Iowa criminal justice system, and the urgency to use all legitimate, necessary means to combat crime.

III. Although our decisions have employed the language "inducement of an innocent person" and referred to the "origin of intent," it is clear these references have been in the context of emphasizing the source of the criminal design as bearing on the extent of inducement, not to that criminal intent required in order to convict. Otherwise, a defendant importuned by one not a government officer or agent likewise should be freed as being "innocent" and not possessing an original intent. We have consistently rejected that argument. State v. Lamar, 210 N.W.2d 600, 606 (Iowa 1973); State v. White, 260 Iowa 1000, 1008, 151 N.W.2d 552, 557 (1967).

However, any further extension of concept suggested by the language referred to in the last paragraph, originating in the *Sorrells* majority opinion, leads inexorably to an examination of defendant's past character and misdeeds, rumored and otherwise, to determine whether he was in fact an "innocent person" prior to inducement, or ever entertained, at some prior point, the forbidden "intent." See Comment, Entrapment in the Federal Courts, 1 U.S.F.L.Rev. 177, 180–81 (1966). It also leads to anomalous, potential situations in which a principal who is directly entrapped by a government agent would be freed, but the accessories the principal brings into the crime would be convicted. See Crisp v.

United States, 262 F.2d 68, 69 (4 Cir. 1958); United States v. Perkins, 190 F.2d 49, 52–53 (7 Cir. 1951).

A hard analysis of each entrapment case invariably leads to the conclusion the defendant, absent the entrapment defense, was technically guilty. He possessed and exhibited the intent to do the illegal act in fact committed, whether he absorbed that intent from a private citizen, a government officer or agent, or the fertile mind of a television playwright. That the intent did not originate with the defendant did not make his intent any less criminal. See Bancroft, Administration of the Affirmative Trap and the Doctrine of Entrapment: Device and Defense, 31 U.Chi.L.Rev. 137, 170 (1963). The frustration of that realization was apparent in one of the earliest Iowa cases involving entrapment, in which the court conceded defendant's guilt (and therefore, his intent), and in the absence of the defense, could do nothing more than berate the law officer and reduce the sentence:

"We are inclined to doubt whether defendant, if left to himself, would have perpetrated the crime of which he has been convicted. Clock stimulated him with advice, aided him by acts, and, through unremitting effort, spurred him on to his undoing. This conduct was outrageous, if, indeed, it was not criminal, and it is aggravated, rather than excused, by the fact that Clock was a peace officer. Frail human nature is prone enough to crime; it should not be purposely tempted; and in this case, it was urged to act. Defendant was sentenced to imprisonment in the penitentiary for a term of three years. In view of the facts, we shall reduce the term to six months."—State v. Abley, 109 Iowa 61, 65–66, 80 N.W. 225, 226 (1899).

From *Heeron* to date, we have never been required by the issues raised in an appeal to identify the footings upon which the entrapment defense in Iowa is posited. We have recognized the defense as a part

of our criminal law. State v. Davis, 175 N.W.2d 407, 410 (Iowa 1970). We have rightly held government action in merely providing the opportunity or facilities for the commission of crime does not constitute entrapment. State v. McGranahan, supra, 206 N.W.2d at 90; State v. Bruno, 204 N.W.2d 879, 882 (Iowa 1973). We have said the defense is permitted not only to those allegedly entrapped directly by government officers, but also to those allegedly entrapped by others acting as government agents, including informers. State v. Lamar, supra, 210 N.W.2d at 606. Today, we hold the theory of the entrapment defense finds a tenable basis in the necessity to avoid abuses in the judicial enforcement of criminal laws and a corollative requirement to objectively examine the conduct of the government officers or their agents.

Careful analysis leads us to reject the test adopted by the *Sorrells* majority. The subjective rationale, which bifurcates the entrapment defense into inducement and lack of predisposition, comes with too much dangerous baggage of hearsay, suspicion and rumor evidence—inevitably prejudicial in the jurors' eyes, and violating our traditional notions of fair play. It encourages law officers to employ extreme measures in trapping one with a criminal record, confident his "rap sheet" will be sufficient to prove he was predisposed to commit the offense anyway. It has the potential of creating jury-confusing instructions, in which the element of intent required for conviction must be determined amid a welter of catch-phrase concepts: "innocent person," "origin of intent," "previous disposition," and "predisposition." The subjective test leads to a semantic battle at trial over who said what first—the defendant concerned about admitting any evidence of "predisposition" and the undercover agent afraid that stating the wrong phrase at the wrong time will lead to a finding of entrapment. It fails to confront the real concern whether the police actions were so reprehensible under the circumstances that a conviction, as a matter of public policy, should not be tolerated. People v. Turner, 390 Mich. 7, 210 N.W.2d 336, 342 (1973).

Although it is claimed the majority of courts still follow the subjective rationale, we find strong support for the position we take here.

The subjective test adopted by the majority in *Sorrells* has been consistently criticized by legal writers. See, e. g., Donnelly, Judicial Control of Informants, Spies, Stool Pigeons, and Agent Provocateurs, 60 Yale L.J. 1091 (1951); Mikell, The Doctrine of Entrapment in the Federal Courts, 90 U.Pa.L.Rev. 245 (1942); Williams, The Defense of Entrapment and Related Problems in Criminal Prosecution, 28 Fordham L.Rev. 399 (1959); Comment, The Entrapment Doctrine in the Federal Courts and Some State Court Comparisons, 49 J.Crim.L.C. & P.S. 447 (1959); Comment, Entrapment: A Critical Discussion, 37 Mo.L.Rev. 633 (1972); Comment, Entrapment in the Federal Courts, supra, 1 U.S.F.L.Rev. at 177; Comment, The Entrapment Defense in Kansas: Subjectivity Versus an Objective Standard, 12 Washburn L.J. 64 (1972); Comment, The Serpent Beguiled Me and I Did Eat—The Constitutional Status of the Entrapment Defense, 74 Yale L.J. 942 (1965).

Other scholarly writings, while not supporting the subjective test, do not wholeheartedly embrace all aspects of the objective test. Bancroft, supra, 31 U.Chi.L.Rev. at 137; Rotenberg, The Police Detection Practice of Encouragement, 49 Va.L.Rev. 871 (1963); Note, Entrapment, 73 Harv. L.Rev. 1333 (1960); Note, Entrapment, 8 Land & Water L.Rev. 645 (1973); Comment, The Defense of Entrapment in California, 19 Hast.L.J. 825 (1968).

The "minority" test of entrapment is growing in acceptance. Note, supra, 8 Land & Water L.Rev. at 659. Several lower federal courts have down-graded or ignored the "predisposition" of defendant and instead have focused on the activity of the govern-

ment agents. Greene v. United States, 454 F.2d 783 (9 Cir. 1971); Smith v. United States, 118 U.S.App.D.C. 38, 331 F.2d 784 (1964); Williamson v. United States, 311 F.2d 441 (5 Cir. 1962), aff'd per curiam, 340 F.2d 612 (5 Cir.), cert. denied, 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 724 (1965); see United States v. Morrison, 348 F.2d 1003 (2 Cir.), cert. denied, 382 U.S. 905, 86 S.Ct. 242, 15 L.Ed.2d 158 (1965).

A number of state jurisdictions have adopted the objective test, or some modification thereof. Grossman v. State, 457 P. 2d 226, 229 (Alaska 1969); People v. Benford, 53 Cal.2d 1, 10, 345 P.2d 928, 935 (1959); People v. Turner, supra, 210 N. W.2d at 342; State v. Sainz, 84 N.M. 259, 261, 501 P.2d 1247, 1249 (1972). With the exception of Illinois, the several states which have adopted or formulated proposed legislation relating to the entrapment defense have rejected the subjective test. See Working Papers of the National Commission on Reform of Federal Criminal Laws, Vol. I, Comment on Entrapment, pp. 313, 316–17 (1970).

The American Law Institute, Model Penal Code, § 2.13 (Official Draft 1962), adopted an objective test in 1959. See Bancroft, supra, 31 U.Chi.L.Rev. at 174–75; Rotenberg, supra, 49 Va.L.Rev. at 893; Williams, supra, 28 Fordham L.Rev. at 415–16; Comment, supra, 37 Mo.L.Rev. at 636, 654. Also articulating an objective test is the National Commissions Study Draft of a New Federal Criminal Code § 702 (1970). Pertinent here is that portion of the proposed federal legislation defining the defense:

"(2) Entrapment Defined. Entrapment occurs when a law enforcement agent induces the commission of an offense, using persuasion or other means likely to cause normally law-abiding persons to commit the offense. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment."

The comment following the rule relevantly states, "The defense is treated primarily as a curb upon improper law enforcement techniques, to which the predisposition of the particular defendant is irrelevant."

 We believe and hold this is the standard which should be adopted in Iowa. It shall apply to the case *sub judice,* to all cases still appealable or on appeal in which the issue has been properly raised below, and of course to all cases subsequently tried in which a proper record is made in trial court.

IV. For the purposes of this litigation there remains only the question whether the objective test we have adopted today should be applied by the court or by the jury. It has been persuasively urged courts must strike down "the use of their process to consummate a wrong." Mr. Justice Roberts, dissenting, in *Sorrells,* supra, 287 U.S. at 455, 53 S.Ct. at 217, 77 L. Ed. at 424. Others have observed the defense will frequently pose evidentiary conflicts peculiarly suited to jury determination. Williams, supra, 31 U.Chi.L.Rev. at 175–76; Note, supra, 73 Harv.L.Rev. at 1344. Certainly the jury can weigh conduct which might induce "a normally law-abiding person" to commit a crime as surely as it can weigh (in a tort case) the required conduct of a "reasonably prudent person." See I Uniform Jury Instructions, Iowa State Bar Ass'n No. 2.1.

 We hold the trial court shall determine the question as a matter of law where there is no dispute as to the facts or the inferences to be drawn from them but shall submit the issue to the jury where the defense is properly raised and there is a dispute in the evidence relating to the operative facts or the inferences to be drawn therefrom.

In adopting an objective test we do not intimate the transactional negotiations and conduct of the government official (or his agent) and the defendant should be ig-

nored. What was said, and the defendant's response to the inducements, should all be considered in judging what the effect of the government conduct would be on normally law-abiding persons. Depending on an evaluation of the facts in each case, prohibited governmental activity might include extreme pleas of desperate illness, appeals based primarily on sympathy, pity or close personal friendship, and offers of inordinate sums of money. United States v. Washington, 20 F.2d 160, 163 (D.Neb.1927); Grossman v. State, supra, 457 P.2d at 230.

V. Finally, we do not intend by this decision to modify the holdings of our prior decisions relating to the exceptions to the general rule prohibiting admission of prior offenses. State v. Armstrong, supra. Similarly, we do not mean to modify our rule permitting proof of other criminal acts which are an inseparable part of the whole deed. State v. Lyons, 210 N.W.2d 543, 546 (Iowa 1973); see State v. Wright, 203 N.W.2d 247, 250–251 (Iowa 1972). Neither do we intend to limit a defendant's right under our prior decisions to place in issue his good character for the traits involved in an offense. State v. Buckner, 214 N.W.2d 164 (Iowa 1974); State v. Hobbs, 172 N.W.2d 268, 271 (Iowa 1969).

We hold this case must be reversed.

Reversed.

MASON, RAWLINGS, LeGRAND and McCORMICK, JJ., concur.

UHLENHOPP, J., MOORE, C. J., and REES and HARRIS, JJ., concur specially.

UHLENHOPP, Justice (concurring specially).

I am unable to concur in divisions II, III, and IV of the court's opinion.

Involved here is the meaning of "entrapment". This court approved the following statement, in reference to entrapment under narcotic drug laws, in State v. Heeron, 208 Iowa 1151, 1154, 226 N.W. 30, 31:

> "[N]o man should be convicted of the violation of such laws, where he had no criminal intent to violate the same, but is induced to become a law violator by reason of the arts and wiles of public officials to depart from the path of being a law abiding citizen into the commission of crime. When the criminal design originates not with the accused, but is conceived in the mind of the state or government officials, and the accused is by persuasion, deceitful representation or inducement lured into the commission of a criminal act, the state is estopped from prosecuting therefor and a defendant should not be convicted under such circumstances. . . . The test is, did the criminal design originate in the mind of the accused, or was such design originated in the mind of the entrapping officer, who lured the defendant into the commission of a crime in order to secure his conviction therefor."

See also State v. Davis, 175 N.W.2d 407 (Iowa); State v. Fagan, 190 N.W.2d 800 (Iowa); State v. McGranahan, 206 N.W. 2d 88 (Iowa).

As the statement from State v. Heeron makes clear, entrapment cases involve this issue: did the criminal design originate in the mind of the accused or in the mind of an officer who lured the accused into the commission of crime? This issue, in turn, raises the following question: what constitutes evidence of whether the accused had a criminal design or the officer induced him to commit the crime? The commonest evidence is proof of other sales within a reasonable period of time or of stocks of illicit drugs.

Let us say that a youth named Smith tells the police that in the past two months he bought LSD on four occasions from John Jones, twice at a certain bar and twice at Jones' apartment, where Jones lived alone and had the pills in a white

box. The next evening an undercover agent goes to the bar in question, sees Jones, and buys two LSD pills from him, using marked money. Officers then arrest Jones. They search him and find the marked money but no more pills. A chemist tests the pills that Jones sold the agent and finds them to be LSD. · The following day, while Jones is still in jail but with the permission of him and his attorney, the officers search Jones' locked apartment and find the white box. It contains 21 tablets of pentobarbital, 87 tablets of LSD, 132 tablets of amphetamines, and 26.3 grams of marijuana, plus $800 in cash (see State v. Dandridge, 213 N.W.2d 903 (Iowa)).

The prosecutor charges Jones with selling LSD to the agent. The prosecutor has the evidence and on trial Jones admits the sale. But Jones testifies that the agent said he felt very low, greatly needed a lift, and talked Jones into selling him the two LSD pills. The agent testifies he made no such statements.

The prosecutor then contends that whether or not the agent made the disputed statements, Jones was not really entrapped—he already had the criminal design and would have made the sale anyway. As proof, the prosecutor puts Smith on the stand in rebuttal to testify firsthand to his four purchases of LSD from Jones. The prosecutor also puts the officers on the stand to testify to the discovery of the white box and its contents, which the prosecutor offers into evidence.

In my opinion, this rebuttal evidence should be received. Otherwise, courtroom realities are not taken into consideration and the jury hears only half of the entrapment matter. The accused is allowed to masquerade before the jury as a mere possessor of a couple LSD pills and to leave the jury with the impression that he would not have sold them but for the agent's statements. The prosecutor is not allowed to counter that impression by showing that the accused made other sales and possessed

a stock of drugs. The jury is thus kept from seeing the entire picture.

The thought seems to exist that the rule admitting such evidence also necessarily admits surmise, rumor, and other hearsay. Comment, 59 Iowa L.Rev. 655, 660. I do not see why this is so. I think the State should be restricted to solid, relevant proof.

I agree that rebuttal evidence of the kind I have illustrated is not admissible under the regular exceptions to the rule disallowing proof of other crimes—motive, intent, absence of mistake or accident, a common scheme, or identity of offender. Rather, such rebuttal evidence is admitted under the test, "[D]id the criminal design originate in the mind of the accused, or was such design originated in the mind of the entrapping officer?" State v. Heeron, supra. As stated in Sorrells v. United States, 287 U.S. 435, 451, 53 S.Ct. 210, 216, 77 L.Ed. 413, 422, "[I]f the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue."

I have been able to find very few decisions supporting this court's present position. Most courts hold the opposite. Among the cases which consider the question in some detail are Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed. 2d 848; United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366; United States v. Granger, 475 F.2d 1022 (9 Cir.); United States v. Cooper, 321 F.2d 456 (6 Cir.); Demos v. United States, ·205 F.2d 596 (5 Cir.); State v. Whitney, 157 Conn. 133, 249 A.2d 238; Commonwealth v. Miller, 282 N.E.2d 394 (Mass.); State v. Van Regenmorter, 465 S.W.2d 613 (Mo.); State v. Dolce, 41 N.J. 422, 197 A.2d 185; People v. Calvano, 30 N.Y.2d 199, 331 N. Y.S.2d 430, 282 N.E.2d 322; State v. Schultz, 27 Utah 2d 391, 496 P.2d 893; Hawthorne v. State, 43 Wis.2d 82, 168 N. W.2d 85.

I concur in divisions I and V of the court's opinion and in reversal of the judgment, but I dissent from divisions II, III, and IV.

MOORE, C. J., and REES and HARRIS, JJ., join this special concurrence.