STATE OF IOWA, Appellee, v. EVA KING, Appellant.

**HOMICIDE: Murder—Evidence.** Evidence reviewed, and held to present a jury question on the issue of defendant's guilt of murder in the second degree. [1]

**CRIMINAL LAW: Evidence—Motive.** On a charge of felonious homicide, it may be shown, as bearing on the issue of motive, that a [2]

quantity of recently stolen property was found on the premises where the homicide was committed, the knowledge of the accused as to the stolen character of said property being a fair question for the jury.

CRIMINAL LAW: Accessories—Degree of Guilt. The degree or quantity of guilt of one who aids and abets the commission of a crime must be determined upon the facts which show the part *he* took in the affair. Instructions under a charge of homicide reviewed, and held correct.

*Appeal from Pottawattamie District Court.*—O. D. WHEELER, Judge.

APRIL 1, 1924.

REHEARING DENIED JUNE 28, 1924.

THE defendant was indicted for the crime of murder in the first degree, in the killing of Robert Murray. Upon a trial, she was found guilty of murder in the second degree. From a judgment committing her to the reformatory at Rockwell City, she appeals.—*Affirmed.*

*John J. Hess,* for appellant.

*Ben J. Gibson,* Attorney-general, *Maxwell A. O'Brien,* Assistant Attorney-general, *C. E. Swanson,* and *Frank E. Northrop,* for appellee.

VERMILION, J.—It is earnestly insisted on behalf of the defendant that the evidence is insufficient to sustain the verdict. The State contends that it is shown that the defendant either fired the fatal shot or was present aiding and abetting another in so doing.

That the deceased was shot and instantly killed while guarding a number of desperate and reckless men, who had been found under circumstances clearly pointing to their guilt of serious violations of law, cannot be doubted. Whether there is evidence that defendant actively participated in their bold attack and desperate ef-

1. HOMICIDE: murder: evidence.

fort to escape from custody, either by herself taking part in the assault or by aiding and abetting those who did, is a question that must be determined from relatively few facts and circumstances, in a conflict so sudden, so fierce, and where human life and personal safety were so lightly held that it bore more resemblance to open warfare than to anything usually to be anticipated in the peace-time effort to enforce the law.     While the pivotal facts are not many, and are established by but few witnesses, to get their proper setting requires a somewhat extended consideration of the larger general situation.

On October 14, 1921, about 2:30 P. M., a party consisting of Knox, a Federal prohibition officer, Lane, a police officer at Council Bluffs, and Morgan, Jones, and Murray, the deceased, special agents or detectives in the employ of railway companies, armed with a search warrant for intoxicating liquors, visited a house known as the Snyder place, some four or five miles from Council Bluffs. The house is situated about a quarter of a mile from the main road, and is reached by an unfrequented lane. When they came to the house, they found a man, a foreigner, variously referred to as "the Dago," or by the name of Joe, or Brown, asleep in a disabled car not far from the house, and took him into custody. A portion of the party went to the back door, and were met by a man, Tierney, with a 38-caliber revolver in his hand. He was disarmed and arrested. They then went into the kitchen of the house, and there found the defendant, Eva King, and her husband. A like revolver was taken from King. In a front room, Moore was found, and another similar gun taken from him. Knox went upstairs, where Haley, known to Knox also by the names of Thompson and Thomas, met him with a drawn gun. This, a 45, was also taken. The five men found at the house were placed on a couch or cot and one or more chairs, in what is spoken of as the living room or front room of the house.

The house is nearly square, and consists of four rooms downstairs. The living room is in the southwest corner. In the southeast corner is the dining room, with an open archway between it and the living room. To the north of the living room is a bedroom, in the northwest corner of the house. In the north-

east corner is the kitchen. There is a door between the living room and the bedroom, and also between the dining room and the kitchen, north of it. Between the kitchen and the bedroom an inclosed stairway leads to the upper floor. At the foot of the stairway, toward the north, at the outside wall of the house, is a small hall, or areaway, as it is called, with doors opposite each other, opening into the kitchen on one side and the bedroom on the other. There is an outside door on the east side of the kitchen, referred to as ''the back door.'' A front door opens from the west side of the living room.

Jones testified that, when the searching party approached the house, he went to the front, and that, in passing a window on the south side of the living room, and looking across the living room and through the open door into the bedroom, he saw the defendant sitting up in bed, and her husband in the act of getting out of bed; that the latter put on his trousers and socks, went into the living room, and stood there looking at him through the window; that he looked out through the dining room and kitchen, and then returned to the bed and passed something to the defendant, sitting in the bed; that King's body was between him and the instrument, and he could not see what it was.

When the defendant and her husband were found in the kitchen, on the entrance of the party after reading the search warrant to Tierney at the door, she was not fully dressed. She returned to the bedroom and began dressing. In this she was interrupted by a search of the bedroom. Knox and Jones searched the bed and the defendant's pocketbook or hand-bag, and found no weapons. They testified to no other search of the bedroom, while the defendant testified that they searched a commode and suit cases that were there. The defendant's clothing was not searched.

Lane was left in charge of the prisoners, Jones was sent to telephone for help, and the rest of the party searched the house. While the search was going on, another man came in through the back door; he was searched, some cartridges but no gun being found on him, and was seated with the others. This man is not clearly identified. One Bullis had rented the Snyder place, under the name of Bennett. In the upstairs rooms a quantity

of clothing, identified on the trial as having been recently stolen from stores in neighboring towns, was found and carried down.

The defendant, after the search of the bed, finished dressing. She came out into the living room, where the prisoners were, and combed her hair at a mirror, then returned to the bedroom and lay down. She called her husband, and something was said about her being sick. King asked and obtained permission to go to her. He passed several times from the bedside to the dining room, to wet a towel with ice water, which was put on her face, and then stood by the bed, fanning her.

Knox and Morgan went outside, and Murray joined Lane in watching the men in the living room. Two of the guns taken from the prisoners had been given to Murray. There was some talking among the prisoners, but it is not shown what was said. There was some disturbance made by Tierney over a coat found in a downstairs closet, that he claimed belonged to him. There is little, if any, dispute as to what had occurred up to this point. The surviving members of the searching party and the defendant are the only witnesses examined as to what had occurred, and, except as to the extent of the search made in the bedroom, and what Jones claimed to have seen through the window, the discrepancies in the testimony are only such as would be expected.

The only persons in the house at this time were Lane, Murray, the defendant, and the men under arrest. Lane's testimony as to what then occurred, summarized from the transcript, is as follows:

"I was standing with my right side towards the door that leads from the kitchen into the dining room. The door was north of me. I could see through it and see the door from the kitchen into the area-way at the foot of the stairway. I was facing about southwest. Murray was in the front room, facing about southeast. We were both facing the men on the couch. While I was in that position, the first thing that occurred was that I was shot from the back, from the door that was partly open, that leads from the kitchen into the bedroom and also the upstairs, through the door that leads from the kitchen into the dining room. The shot came from the stairway, the door that leads from the bedroom—from the kitchen into the bedroom,

and also goes upstairs. I turned around a little bit. I was shot through the shoulder and arm. I turned around, and the second shot struck me across here, and cut me clear across the chest, and the third cut my watch chain off. I was back of the door that leads into the kitchen, a little bit, facing those fellows on the cot. He got me from the stairway, and the bullet struck me under the shoulder blade and went out through my shoulder and came out through the arm. A bullet went in there and came out there [indicating], and it cut me clear across the chest,—I still have the mark. I had my watch chain in my pocket, and it shot the watch chain off. King fired those shots: I saw him fire two of them. They all came from the same place. The first shot was fired right from the door, that struck me in the back, and I turned around, and there were two more fired right quick, and I shot back, and just at that time somebody opened fire from the front, and shot at me from the front, and one of them creased me across here [indicating], and at the same time the shooting started at me, the shooting started in the bedroom, and all the fellows that were on the cot rushed to the bedroom. That was immediately after the first shot was fired at me that the shooting started in the bedroom. When they shot at me from the front room, I started to go out through. I met King face to face. I started to go through the kitchen—in the kitchen. I shot at him and ran through the back door. He followed out, and I think he shot one shot at me outside. He fell at the corner of the house. I turned around and shot on the outside. I think King fired four shots, altogether, at me. None of the men were in the bedroom at the time King shot at me. Mrs. King was in the bedroom. I could not say who fired at me from the front room after King started shooting,—it was one of the men. After I came out, and after King fell at the corner of the house, two men followed out, shooting, and I went directly to the front, and Mr. Knox and Morgan coming that way, and they went to shooting back. Moore was one, and the only one, that came to the door that I saw. I went to the front of the house, thinking they would come out of the front door and come around on us, and I met Tierney, or Tierney was at the front door. The Dago, he got outside and was lying on his stomach at the southwest corner

of the house, and they both went to shooting at me. I returned the fire at Brown. Tierney was in the doorway, so I couldn't shoot at him very well there."

The witness then described the somewhat general engagement that followed, saying that there was shooting from an old house in a grove on a hill to the east, and from the orchard north of the house; that someone was shooting with a rifle; and that the bullets struck on the dirt all around; and that the shooting outside continued for half to three quarters of an hour.

He testified further that he saw Mrs. King leave the house, probably five or ten minutes after the shooting started in the house, after he got out; that she went first to an outhouse, and from there down across the draw toward the old house in the grove.

Knox, who was near a garage some thirty feet north of the house when the shooting started in the house, testified that there was one shot closely followed by another, and that there may have been a third, and that, about the time he reached the kitchen door, rounding the northeast corner of the house, there were a number of shots fired from the house. He testified that the shots came from the house proper, and that he would not want to state in which part, but that, from the sound of the shots, from where he was standing, he would judge them to be at the front part,—whether the bedroom or the living room, he could not say; that it was hard to determine, except that they did come from the house proper. He described the subsequent happenings much as did Lane, and said it might have been ten or fifteen minutes after King came out that Mrs. King came out.

Morgan testified that he was at the garage when the shooting started at the house. He said:

"We heard a lot of shooting. It apparently came from the direction of the house,—in the bedroom or front room. I am not able to say, but the sound came from that part of the house. It sounded to me as if there were a number of shots."

His description of what followed does not differ in material respects from the accounts given by Lane and Knox. He testified:

"After King came out, Moore came out the back door, and

shot several times at us. I shot back at him. He ran into the house again, into the kitchen. Mrs. King came out. I could not say exactly how long after her husband was shot that Mrs. King came out,—I judge five or ten minutes.''

The house was entered after the arrival of officers from Council Bluffs. Tierney was found in the basement, unarmed. No others of the former prisoners were there. Murray was found dead, lying on his face in the bedroom, about midway between the foot of the bed and the door leading into the stairway and kitchen, with his head to the north. His holster, with his revolver in it loaded with undischarged cartridges, was on the body. His coat was thrown back, and his two hip pockets were pulled inside out. Some papers were lying by the body, and his pocketbook and some other papers were found in the dining room. Two bullet wounds were found upon his body. One bullet had entered on the left side, between the second and third ribs, passed diagonally across the chest, severed the pulmonary artery, passed through the spinal column, severing the spinal cord, and lodged beneath the skin at the side of the spinal column. Its course was slightly downward from the point of entrance to the point of lodgment, the difference being about an inch. The bullet was a 38-caliber, steel-jacket bullet. The testimony showed that Murray could not have stepped after receiving this wound, and that death resulted in about twenty seconds. Another bullet wound was found in the abdomen, below the first. Bullet holes in the holster found on his body under his left arm corresponded with the point of entrance of these wounds.

The testimony showed without dispute that the revolver King had in his hand at the time he was killed outside the house had four discharged and two loaded cartridges in it, one of which had been snapped, but not exploded. The loaded cartridges had soft lead bullets in them.

The defendant testified as follows: ' That she was married in Helena, Montana, and had been married four years; that she came alone to Council Bluffs in April, 1921, her husband being there before her; that, after a few days, they went to the Snyder place, and stayed four or five weeks; that they then stayed in Omaha, in a hotel and in furnished rooms; that they were in Los

Angeles till about the first of September, when she went alone to Portland and to Boise, Idaho, to visit her mother, and returned to Council Bluffs, where she registered at a hotel under an assumed name, because she knew her husband was hauling whisky, and might get into trouble, and she would not be mixed up in it; that she was at the Snyder place once or twice with her husband, Thomas King, after she came back, and before the trouble; that she went to the Snyder place two days before the shooting, because she was ill and wanted to be with her husband; that she went back to Council Bluffs with Bullis in a car, consulted a doctor, and procured a prescription; that, when she returned, she went to bed and stayed there; that, on the day of the shooting, her husband had been around the house, waiting on her; that she first heard quarreling in the back yard, and got up and went to the kitchen; that her husband was there; that she was fully dressed, except her silk skirt and her waist, and had on a rain coat of her husband's; that she went back to the bedroom, and two officers came in, and she asked them if she could dress, that they said "yes," and she started to dress; that she called to her husband to know what the trouble was that he didn't come in right away, and he did not answer; that two officers searched the bed and her pocketbook, and one searched the stand and in the suit cases that were around in the room; that, when they left, she finished dressing, and went in the dining room and combed her hair, then went back to the bedroom and lay down; that her husband came in and started to fan her; that he went back and forth several times with a wet towel that he put on her face; that, the last time he came in, Murray followed him; that there was something said which she did not hear, and the next thing she noticed, they were scuffling; that she saw a gun in Murray's hand, and in the scuffle they came to the foot of the bed; that in just a second there was the report of a gun, and she saw the gun in her husband's hand, and he ran out of the room; that there were shots in the other part of the house and outside; that she thinks Murray fell just as her husband went out of the room; that she was so shaken for a second that she could not do anything, and as soon as she could, she jumped up, took her hat, and ran out of the back door, carrying her

pocketbook; that she ran east of the house toward an outhouse, and crossed a ditch, stopped, and turned around, and the officers back of the garage motioned to her to come there; that she started back, and got about twenty feet from the southeast corner of the house, and stopped, and the officers were firing at somebody behind her; that she then went west of the house and ran down the lane to the main road; that she did not at any time have a weapon in her possession, and did not shoot at any time.

On cross-examination, she admitted signing the name Eva Burns to the lease of a place north of Council Bluffs, but claimed that it was done at the request of her husband for people by that name who occupied the place, and that she visited there several times. She denied that her husband was on the bed before the officers came in, and got up and dressed hurriedly. When she left the Snyder place after the shooting, she walked to Council Bluffs, and was arrested there that evening in company with Bullis, who had been met near the house, leaving the premises, while the shooting was still going on outside, by Jones as he returned after telephoning for help.

There is testimony that, on the occasion when she went to Council Bluffs with Bullis to consult a doctor, she, Bullis, George Moore, and another woman were together at Broadway and Twenty-second street. This she denied. There is testimony also that, after her arrest, the defendant said that her husband's name was Henry King, and hers was Alice King; that she did not know anything about the shooting of Murray; that she was in another room, and jumped and ran when the shooting started.

Upon the body of King, $720 was found, and the defendant, at the time of her arrest, had $1,457, a portion of it in her stocking. Part of this, she testified, was given to her by her husband while he was fanning her.

That a verdict of a jury in a criminal case is not conclusive is, of course, true; and it has been held that this court should interfere though the verdict is not wholly without support, if it is clearly against the weight of the evidence. *State v. Carson,* 185 Iowa 568. But it is not the province of the appellate court, as a matter of right and power, to substitute its conclusion upon

facts in cases where a jury has returned its verdict, unless it appears that there is such a want of support for the finding as to require that action. *State v. Hessenius,* 165 Iowa 415.

This record has been read and reread with care, and we have come to the conclusion that, while the evidence is circumstantial in character, there is not, upon the whole record, any such a want of evidence of defendant's participation in the killing of Murray, nor is the verdict so clearly against the weight of the evidence, that we ought to interfere.

There are but two witnesses who testify to the transaction in the house immediately before and at the time the shooting commenced. The jury might well have believed Lane's story of the transaction. In that event, not only must they have disbelieved the defendant's story that Murray was killed in a scuffle with her husband, but it was impossible that her husband, if he was then engaged in shooting at Lane from the doorway between the kitchen and the areaway at the foot of the stair, could have shot Murray in the bedroom, and in another direction. Lane says that the first shot was fired by King, and struck him in the back; that King fired two more shots at him in the house, and one outside. Only four exploded cartridges were found in King's gun. The remaining loads were soft lead bullets, and it is undisputed that Murray was killed by a steel-jacket bullet. If the first shot was fired by King at Lane, and he continued to shoot at Lane and followed him out of the house, as Lane says, King was not in the bedroom at the time Murray was killed. If King was not then in the bedroom, it is clear that there was no one in that room when the shots were fired there but the defendant and Murray, if he was then there. According to Lane, none of the prisoners in the living room went to the bedroom until the shooting in that room. That Murray did go into the bedroom, and was there shot, is clear from the fact that his wound was one that deprived him of the power of locomotion, and was almost instantly fatal. While, it is true, no weapon was seen in the possession of the defendant at any time, there was testimony that, before the searching party entered the house, but when King was aware of the presence of strangers at the house, he gave the defendant something. She was the only inmate of the

house whose person was not searched, and was the only one whose movements were at all times unrestricted. That there were guns about the premises or in the possession of the inmates, in addition to the two that were probably taken from Murray's body, is plain. The circumstances strongly indicated that the two guns previously given to Murray were taken from his body after he was shot. The jury might have found that Murray was killed at a time when he and the defendant were the only persons in the room, and she the only one of the inmates of the house who had not been searched for weapons. As between her story of the manner of Murray's killing and Lane's account of the transaction in the house, the jurors, being the judges of the credibility of the witnesses and the facts of the case, were entitled to determine which they believed to be true. If they accepted Lane's version, as they had a right to do, they might well have found that the only reasonable conclusion from all the facts and circumstances was that, at the time Murray was killed, the defendant and Murray were the only persons in the bedroom, and that he was killed by a shot fired in that room. This, in connection with the further fact, which might well have been found from the evidence, that she, after her arrest, stated that she was not in the room when he was killed, and knew nothing about it, and on the trial testified that she was present, and saw the killing, but gave an account that was not credited, does not present such a situation as requires us to interfere with the verdict.

Moreover, there was evidence from which it might have been found, we think, that, if she did not herself fire the fatal shot, she gave such assistance to the desperate men who made what appears to have been a concerted attack upon Murray and Lane that a finding that she aided and abetted the one of them who did fire the shot ought not to be disturbed. The jury might properly have found that it was through her or her husband, whose freedom of movement was secured to wait upon her at her call, that arms were obtained by men who had previously been disarmed in her presence, with which to make the attack. As has been said, while no weapon was seen in her possession, she was the only inmate of the house who was not searched; there was testimony that her husband had given her something before

his arrest; and there was ample opportunity for her to give a
weapon to him afterward. That he did obtain a gun is beyond
question. If her story that he took it from Murray in a scuffle
is not credited, it was a question for the jury whether he took
advantage of the permission given him to minister to her, to arm
himself and supply arms to the others, and whether she design-
edly secured for him that opportunity. As bearing upon
whether she designedly or innocently procured for her husband
and the others the opportunity to arm themselves for an attack
upon their guards, the jury was entitled to consider the extent
of her association with the men; her knowledge of her husband's
occupation as a whisky runner; what knowledge she had, if any,
as to other criminal activities of the men resorting to the place;
whether her illness was real or feigned or exaggerated; and many
other circumstances that might be mentioned.

The verdict does not show which view of the situation was
adopted by the jury. There was, we think, sufficient evidence
to support the verdict upon either theory.

Complaint is made that the State was permitted to introduce
in evidence, over objections, a quantity of clothing and other
merchandise found in the house, and to identify the articles as
having been recently stolen. It is said that
2. CRIMINAL LAW:   there was no evidence that the defendant had
   evidence: mo-
   tive.           any knowledge of the presence of the articles, or
that they had been stolen. In view of the evidence of her rela-
tions with the place and the inmates, as well as the occurrences
immediately preceding the killing, we are of the opinion that
the question of her knowledge with respect to these articles was
a question for the jury.

The evidence was properly admitted, as tending to show the
motive prompting the defendant and the others in the house.
The court carefully limited its effect to that, in the instructions.
If the defendant aided and abetted another in the assault, while
she could not be held to entertain the intent of the person firing
the fatal shot, unless she participated in such intent, or with
knowledge of it aided and abetted the assault, it was proper to
show the intent of the principal, and, in that connection, the
motive that actuated him; and the question whether the defend-

ant participated in the intent of the perpetrator was for the jury. See *State v. Kline,* 54 Iowa 183; *State v. Seymour,* 94 Iowa 699; 16 Corpus Juris 590, 600.

What has been said above disposes of the contention that it was error to instruct the jury that the defendant might be found guilty if she aided and abetted another in the commission of the offense. There was evidence that warranted the giving of the instructions upon that subject.

There is complaint of an instruction that said, in substance, that, where one person contemplates an assault upon another, and a third person, with knowledge of such wrongful intent, aids or abets the commission of the wrongful act, and

3. CRIMINAL LAW: accessories: degree of guilt. .

in its commission the one assaulted is killed, the one so aiding and abetting is responsible for the killing, even though he did not at the time contemplate that the killing should occur; but the nature of the unlawful act which he contemplated should be done, and his intention in so aiding or abetting it, would affect the degree of his guilt. In the next instruction it was stated that, if the one aiding and abetting contemplated no more than a battery, then his crime would not be greater than manslaughter; but if he contemplated that the person assailed should be slain, or that some great bodily harm should be inflicted, then he would be guilty of murder in the first or second degree, depending upon the circumstances attending his act. This was in accord with the rule laid down in *State v. Smith,* 100 Iowa 1, where it was said that the guilt of a person who aids or abets the commission of a crime must be determined upon the facts which show the part he had in it, and does not depend upon the degree of another's guilt. *State v. Wolf,* 112 Iowa 458; *State v. Phillips,* 118 Iowa 660; 12 A. L. R. 276, note.

Another instruction directed the jury to consider certain designated matters and circumstances, so far as shown in the evidence, and each and every other fact and circumstance in evidence tending to throw light thereon, and to determine "what, if any, connection defendant had with the assault in question, if such is shown, and whether she had any connection whatever therewith." There was no error in this. The instruc-

tion did not assume that any of the circumstances mentioned were established, nor did it assume that defendant had knowledge of them.

It is said that the verdict is the result of passion and prejudice on the part of the jury, and in that connection complaint is made of an article appearing in a local newspaper during the trial. There is no showing that the article in question was ever read by the jurors, or ever came to their attention. There is nothing to indicate passion or prejudice on the part of the jury. The circumstances of the killing were such as necessarily to excite public interest and feeling, but this is something that inheres in the crime itself, and is not to be prevented. The case was fairly tried; the instructions of the court, so far as set out in the abstract, were very full and carefully drawn; and, as we have said, the evidence is sufficient to sustain the verdict.

The judgment is—*Affirmed.*

ARTHUR, C. J., STEVENS and DE GRAFF, JJ., concur.