STATE of Iowa, Appellee,

v.

Herman (NMN) HARMON, Appellant.

No. 58371.

Supreme Court of Iowa.

Jan. 21, 1976.

John W. Ackerman, Cedar Falls, for appellant.

Richard C. Turner, Atty. Gen., Earl W. Roberts, Asst. Atty. Gen., and David J. Dutton, County Atty., for appellee.

Heard by MOORE, C. J., and MASON, LeGRAND, HARRIS and McCORMICK, JJ.

McCORMICK, Justice.

Defendant appeals his conviction and sentence for robbery with aggravation in viola-

tion of § 711.2, The Code. He contends the trial court erred in two evidentiary rulings and in finding the evidence sufficient for jury consideration. We find no merit in his contentions and affirm the trial court.

This offense allegedly occurred on Thursday, January 23, 1975, at about 7:00 p. m. The State asserts that at that time the defendant and two other black males, Bobby Cage and John Kidd, robbed at gunpoint the Shamrock Tap in Waterloo and several of its patrons. The State also claims that Corby Kidd, wife of John Kidd, was an accomplice, having been in the tavern a few minutes before the robbery for the purpose of "casing it". None of these persons testified at the trial. Identification of the three men who perpetrated the robbery depended upon circumstantial evidence.

We recite the evidence in its light most favorable to the verdict. See *State v. Staker*, 220 N.W.2d 613, 617–618 (Iowa 1974).

The State's key witness was Angela Love. On the date of the robbery she and her three-year-old son resided with Edgar Gibson in a Waterloo apartment. She was acquainted with the Kidds, Cage, and defendant. In the late afternoon on the day involved she and her son accompanied Gibson when he drove to Lindbergh's Tavern on Sumner Street, just off East Fourth Street, in Waterloo, looking for Cage. Gibson went into the tavern and came out with Cage, the Kidds, and defendant. They stood near the Gibson car and talked. Love could not hear all that was said but did hear Gibson ask Cage "what he was going to be doing later" and heard Cage say "he was going to make some money". She said Cage asked Gibson what he was going to do "and Edgar said he was going home. And we left." She testified that she, Gibson, and her son then returned to their apartment where they remained until evening.

Ellen Stocks, bartender at the Shamrock Tap, testified to Corby Kidd's visit to the tavern shortly before the robbery. She said that at about ten minutes to seven Corby Kidd, identified by the witness from a photograph, entered the tavern, went to the waitress stall at the middle of the bar, purchased a 7-up, and looked over the people in the tavern. Then she left.

Events during the robbery must be reconstructed piecemeal from the testimony of Stocks and several patrons of the tavern. When so reconstructed, the following picture appears.

A few minutes after Corby Kidd left, three black males entered the tavern. All were armed and wearing ski masks. Two of them entered from the rear and one from the front. One who entered from the rear wore a gray flannel coat and gray denim pants which had a chevron pattern. He held a 410 bolt-action shotgun on the bartender. There was black tape on the handle of the shotgun. The second man who entered from the rear wore a green army jacket. He had a handgun, and he went forward to remove the money from the cash register. The man who entered the tavern from the front wore plaid slacks. He carried a handgun. The two men who entered from the rear were slender and about six feet or six feet one in height. The man who entered from the front was shorter.

About a dozen patrons were in the tavern. All were in booths except two, who were on barstools near the front. As the robbers entered, one said, "All right, everyone on the floor." When Edwin Schmidt, sitting on a barstool, did not respond fast enough, the robber at the front of the tavern knocked him and the barstool to the floor and said, "You motherfucker, get down on the floor." A woman who had been on a barstool moved toward a pool table and got down near or under it. The robber who knocked Schmidt off the barstool put his gun next to the head of a man sitting in a booth with his wife and daughter and told him to get on the floor. The daughter let out a scream and was quieted by her mother.

Money was taken from the cash register and from the patrons. The men were in

.

the tavern a total of one to five minutes. Then they all ran out the rear of the tavern where a witness saw them heading south. The tavern was at 737 Logan Street. John Kidd's mother's home was several buildings south on the same block at 703 Logan.

Love said she and Gibson left their apartment after having been there an hour or so and drove back toward Lindbergh's to look for Cage. She said it was then early evening; it was dark. As they proceeded on East Fourth Street toward Lindbergh's they saw Corby Kidd, alone, driving a 1975 blue Maverick in the opposite direction. Corby honked and pulled into a service station drive. Gibson drove alongside. Corby told Gibson that Cage wanted to see him. She said "Follow me". Gibson followed Corby in his automobile to a nearby house. Gibson and Corby entered and returned to the cars in a few minutes, accompanied by Cage, John Kidd, and defendant. The three men got in the Gibson vehicle. Both cars were driven to the Gibson apartment.

When they arrived at the apartment, the four men and Corby Kidd went to the living room, and Love went to the adjacent kitchen. While in the kitchen Love said she heard a conversation which took place among those in the living room. Then she testified as follows:

"Q. Now, what were their exact words? What exactly did you hear said? A. He—somebody, I don't know who it was—

Q. Now, who was it? Was it a man or a woman? A. It was a man.

Q. Okay. Go ahead and say exactly what the person said, the man said. A. He said, 'I hit this motherfucker and knocked him off the barstool.'

Q. Okay. And do you recall what else was said by anyone in the living room at that time? A. Somebody said something about it works better with three guys than two guys.

Q. It works better with three guys than two guys? A. Yeah.

Q. Okay. And did they say anything further about how the three guys worked on this occasion or the occasion they were referring to? A. Something to the effect that two went in the back and one in the front, or one went in the front and two went in the back, something like that.

Q. Okay. Did they say anything else about what had happened or what reaction there was by the people in the place? A. No, there was something said about a girl laying under a pool table screaming.

Q. All right. Did you hear any woman say anything at that time? A. No."

She also testified that Corby Kidd told her she had driven the car "during this incident" and had parked it in John Kidd's mother's driveway.

Love said that after 20 minutes to a half hour, they all got ready to leave the apartment in order to go to Cedar Rapids. Before they left, defendant, who is six feet one or two inches tall, asked Gibson if he would trade jackets with him. Defendant was wearing a "green army coat". Gibson, who is five feet five inches tall, had on a short brown leather jacket which he agreed to trade. The leather jacket was short in the sleeves for defendant. Gibson did not wear the green jacket. Love hung it in a closet, and Gibson later put it in the basement. The whole group traveled to Cedar Rapids in the Gibson car, where they visited a couple of places. At about 10:15 p. m. Cage placed a telephone call. They returned to Waterloo at about midnight.

Evidence showed John Kidd to be between five feet ten and six feet tall, and Bobby Cage, the shortest of the trio, to be five feet eight or nine.

Evidence also showed the 1975 Maverick had been rented by Blanche Hoosman, a cousin of Cage. The Kidds and Cage had visited her home before noon on the day of the robbery. About 2:30 p. m. Cage returned, gave her a ride to work in the car, and borrowed it from her. He was to pick her up when she got off work that evening.

Instead she was picked up by her babysitter, Michelle Bell, who drove the Maverick. The telephone call placed by Cage in Cedar Rapids was to Michelle Bell at the Hoosman residence in Waterloo, telling her where the Maverick was, and asking her to pick up Hoosman.

About a week after the robbery a shotgun identified as the one used in the robbery, a handgun like one used in the robbery, and a sack of clothes containing gray denim coveralls, identified by the Shamrock Tap bartender as having a chevron pattern like that observed on the pants of one of the robbers, were found in the basement of the Hoosman home. Hoosman testified these articles did not belong to her and she did not know who put them in her basement.

Michelle Bell testified she was with Cage in the Maverick on the Sunday after the robbery when they were stopped by the Waterloo police and Cage was arrested. Bell took the car back to the Hoosman home. Bell said she later saw John Kidd remove clothes from the trunk of the Maverick. She did not say what he did with them, and she asserted she did not remember them well enough to know whether they were the clothes later found in the Hoosman basement.

Defendant did not testify and rested without offering any evidence. He moved for directed verdict on the ground of the alleged insufficiency of the evidence to identify him as one of the persons who robbed the tavern on the occasion involved. His motion was overruled. The jury subsequently returned a verdict of guilty, and defendant was later sentenced. This appeal followed.

I. Defendant contends the trial court erred in receiving over his objection part of an alleged statement of Michelle Bell. During her testimony Bell first denied having seen John Kidd remove a 22 rifle and clothing from the trunk of the Maverick at the Hoosman home on the Sunday following the robbery. The State confronted her with a written statement she allegedly gave the police on February 4, 1975, which included a recital that she saw Kidd remove a 22 rifle and clothing from the trunk of the Maverick, adding, "I saw the rifle and it had black tape wrapped around it and it didn't look like it was in very good shape." Bell then admitted seeing Kidd remove the clothing from the trunk but persisted in denying she saw him remove the weapon.

The State offered the entire statement. Defense counsel objected on the ground it contained "hearsay evidence which is prejudicial". The county attorney amended his offer to include only the portion of the statement referring to the alleged removal of the gun and clothing from the car. No objection was made to that offer.

No question was raised regarding the right of the State to impeach the witness.

Defendant, represented by different counsel on appeal, now maintains it was error for the court to receive the portion of the statement which was offered. Despite an instruction of the court limiting the jury's consideration of the exhibit to the issue of impeachment, he argues the jury would inevitably consider the statement as substantive evidence probative of defendant's guilt. Defendant asserts that the probative value of evidence of the incident described in the statement on that issue was far outweighed by its prejudicial effect. See *State v. Slauson*, 249 Iowa 755, 760, 88 N.W.2d 806, 809 (1958) ("Evidence having a minimum of probative quality and which is highly prejudicial must be excluded.").

■ This contention was not urged in the trial court. No objection was made at trial to the portion of the statement which was received in evidence. Nor did the earlier hearsay objection raise this issue. The present complaint is made too late. *State v. Droste,* 232 N.W.2d 483, 487–488 (Iowa 1975).

II. Defendant also challenges the admissibility of photographs of Corby Kidd and

John Kidd. At trial the photographs were objected to as "incompetent, irrelevant, immaterial," and "prejudicial". The photographs were mug shots taken by the Waterloo police department.

■ Under the principles explained in *State v. Clay,* 213 N.W.2d 473, 476–478 (Iowa 1973), we do not believe the trial court erred in overruling the objection insofar as it was grounded on the assertion the photographs were "incompetent, irrelevant, and immaterial." Much testimony was received regarding the alleged involvement of John and Corby Kidd in the offense for which defendant was being tried. Neither testified in the trial. The photograph of John Kidd had some relevance in that it permitted the jury to see what the man whom they had heard described and discussed in the evidence looked like. Admittedly, the photograph had no probative value in identifying him as one of the robbers other than to show he was a black male. Nonetheless, we could not say the trial court abused its discretion in finding the photograph had some logical tendency to establish a material proposition in the case.

■ The photograph of Corby Kidd had substantial relevance. It was the means by which she was identified by the bartender as the woman who was in the tavern for a short while just a few minutes before the robbery.

In amplifying his assertion that the photographs were "prejudicial", defense counsel added the following:

"I would still like to renew that objection on the ground that it's prejudicial, because these people are, whether we know it, whether the jury knows it or not, at least Corby Kidd was tried and acquitted. Her husband's case is still pending trial, and what we are attempting to do by the introduction of these photographs into the record is to say, 'Well, here is an accomplice, and they have all been charged with the same crime.'"

After this objection the trial court directed that the photographs be cropped to remove identifying data that would show they were mug shots. Although defendant asserts they still contained markings showing they were property of the Waterloo police department, we have examined the photographs certified as exhibits in the case and find all markings were obliterated. Nevertheless, they still show a front and side view as is customary in mug shots.

It was the State's theory of the case that the Kidds, Cage, and defendant did commit the offense together, that each was an accomplice of the others. The State's evidence all tended to establish that theory. Defendant's objection at trial does not clearly predicate the claim of prejudice on the fact the photographs were mug shots. Certainly, the facts, if they be true, that Corby Kidd had been acquitted of the offense and John Kidd had not yet been tried for it, would not affect the admissibility of the photographs. We do not perceive any prejudice which would accompany the use of photographs of alleged accomplices as such. The assertion of prejudice must be based upon the fact these particular photographs were mug shots.

We will assume, without deciding, that defendant's objection was sufficient to alert the trial court to his present claim that the photographs were prejudicial because they were mug shots and the State sought to establish defendant's guilt by association through their use.

■ The principle relied upon by defendant is expressed in rule 403, Federal Rules of Evidence:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

In *State v. Wallace,* 259 Iowa 765, 769–771, 145 N.W.2d 615, 618–619 (1966), we discussed the same principle. We held that

when evidence has a minimum of probative quality but its admission would have a wrongful effect on the jury because of the baggage it brings with it, the trial court should exclude it upon proper objection. The objection must be sufficiently specific to alert the court to the objector's theory of undue prejudice. Such an objection is directed to the contention that otherwise relevant evidence is too remote and prejudicial to be accepted. "It follows, then, that primarily it is for the trial judge to decide, first, whether the offered evidence has some probative force, and second, to balance the value of that evidence * * * against the danger of its prejudicial or wrongful effect upon the triers of fact." *Id.,* 259 Iowa at 770, 145 N.W.2d at 619.

█ The trial judge's decision involves an exercise of his discretion. We reverse only when we find he has abused his discretion in balancing the probative force of the evidence against the danger of undue prejudice. *State v. Wright,* 203 N.W.2d 247, 251 (Iowa 1972) ("Exercise of trial court discretion therefore goes beyond the question of categorical classification to a determination whether the 'minute peg of relevancy will be entirely obscured by the dirty linen hung upon it.' "); see *State v. Maestas,* 224 N.W.2d 248 (Iowa 1974); *State v. Johnson,* 224 N.W.2d 617 (Iowa 1974).

The question is whether the trial court abused its discretion in admitting the cropped mug shots of John and Corby Kidd.

█ The photograph of John Kidd was offered during the testimony of Robert Greenlee, a Waterloo police sergeant. Greenlee testified without objection before the photograph was offered that he had arrested John Kidd for the robbery a few days after it occurred. In view of this, we find it difficult to see how defendant can complain that the jury might learn the same fact by reason of the State's offer of the cropped mug shot of John Kidd. Use of cropped mug shots of two alleged accomplices in analogous circumstances was held non-prejudicial in *United States v. DeVerse,*

464 F.2d 80 (8 Cir. 1972), cert. denied, 409 U.S. 988, 93 S.Ct. 342, 34 L.Ed.2d 253. See also *United States v. Sawyer,* 504 F.2d 878 (5 Cir. 1974); *United States v. Hasley,* 465 F.2d 968 (9 Cir. 1972); *State v. Moran,* 131 Iowa 645, 109 N.W. 187 (1906); annot., 30 A.L.R.3d 908 et seq. Under this record, it was not an abuse of discretion for the trial court to overrule defendant's objection to the John Kidd photograph.

█ Even though no one testified that Corby Kidd had been arrested for the offense, the greater probative value of the State's use of her cropped mug shot justified its admission against the claim of prejudice. The trial court did not abuse its discretion in finding its probative value was not substantially outweighed by the danger of unfair prejudice.

█ Defendant separately contends the photographs should not have been admitted on another ground. He argues that the State offered them to reveal to the jury John Kidd is black and his wife Corby is white in a blatant appeal to racial prejudice. This contention was not made in his trial court objection and will not be entertained here. We do not intimate any view on the merits of this contention.

Reversible error has not been shown in the trial court's rulings admitting the photographs.

III. Defendant's final contention is that the evidence was insufficient for jury consideration. We take this assignment of error to be a challenge to the trial court's order overruling his motion for directed verdict.

█ The State sought to prove defendant was one of the robbers by circumstantial evidence. The test of sufficiency of circumstantial evidence in a criminal case is the following:

"Where * * * all evidence connecting the accused with the alleged crime is circumstantial, this court has consistently adhered to the principle that circumstan-

tial evidence on each and every essential element to conviction is sufficient to warrant a finding of guilt if it satisfies the jury beyond a reasonable doubt. Circumstantial evidence may be equal in value to and sometimes more reliable than direct evidence. However, where circumstantial evidence alone is relied on as to any one or more of the essential elements the circumstance or circumstances must be entirely consistent with defendant's guilt and wholly inconsistent with any rational hypothesis of defendant's innocence and so convincing as to exclude a reasonable doubt that defendant was guilty of the offense charged. Like direct evidence it must raise a fair inference of guilt, generating something more than suspicion, or speculation or conjecture." *State v. Jellema,* 206 N.W.2d 679, 681 (Iowa 1973).

The issue is whether the circumstantial evidence in this case could reasonably be found by the jury to be inconsistent with any rational hypothesis of defendant's innocence. *State v. Barnes,* 204 N.W.2d 827, 829 (Iowa 1972).

The State relies on a number of circumstances which it contends would permit such a jury finding. Defendant was with the Kidds and Cage before and after the robbery. While they were together before the robbery, Cage told Gibson he was going to "make some money". Defendant was wearing a green military jacket like that of one of the robbers, and he answered the general description of the robber wearing that jacket. That is, he is a black male, slender, and about six feet one in height. John Kidd and Cage fit the general descriptions of the other two robbers. After the robbery, the perpetrators fled in the direction of John Kidd's mother's house. The jury could find, based upon her later statement, that Corby Kidd was waiting there for them in the blue Maverick. Next, when Gibson began looking for Cage, it is somewhat unusual that Gibson would be led to a house to meet Cage, John Kidd, and defendant and that the three men would get in Gibson's car to be taken to the Gibson apartment while the Maverick was evidently available as transportation throughout this period.

■ At the apartment, Gibson and the other men immediately engaged in a conversation which the jury could readily find was a discussion of the robbery. Although witness Love could not say defendant was one of the speakers, no hearsay objection was made to her recital of the conversation. If the State sought to offer the conversation as a tacit admission by defendant, it would have been inadmissible on that ground if timely objection had been made. We have rejected the tacit admission rule in criminal trials. *State v. Kelsey,* 201 N.W.2d 921, 927 (Iowa 1972). But evidence of the conversation was received without objection. In such a situation the evidence is properly in the case and may be considered for all purposes, even if it would have been excluded upon proper objection. It is entitled to its full and natural probative effect. *Ackerman v. James,* 200 N.W.2d 818, 824 (Iowa 1972).

■ The conversation in the Gibson apartment had probative force or relevancy in tending to prove defendant's identity as one of the robbers if it made that inference more probable than it would be without the evidence. *State v. Mathias,* 216 N.W.2d 319, 322 (Iowa 1974). We believe it did. We are unable to say as a matter of law that the jury could not reasonably find it more probable that defendant was one of the robbers by reason of that evidence having been received than if the evidence had not been received. When considered with the other evidence, the conversation could reasonably be viewed as a report to Gibson of the events of the robbery by its three perpetrators.

The jury could also reasonably find that Corby Kidd drove the same three men to and from the area where the robbery took place. Corby's statement to Love about having driven the robbers was made while the three men were sitting in the living

room talking with Gibson. Love's testimony regarding Corby's statement was objected to as hearsay, but the trial court overruled the objection and held it was untimely. That ruling is not assigned as error. In the context in which Corby's statement was allegedly made, the jury could reasonably find she was talking about having driven the three men sitting in the living room with Gibson to and from the robbery scene.

One additional event is entitled to some significance. That is defendant's exchange of jackets with the much shorter Gibson. While entitled to little weight as an isolated incident, it fits logically into the web of incriminating circumstances surrounding defendant.

Under the entire record, we believe the circumstantial evidence in this case would support a fair inference of defendant's guilt. The circumstances could reasonably be found by the jury to be, beyond a reasonable doubt, inconsistent with any rational hypothesis of defendant's innocence.

No reversible error appears.

Affirmed.