STATE of Iowa, Appellee,

v.

James Ray FRYER, Appellant.

No. 58103.

Supreme Court of Iowa.

May 19, 1976.

Earl T. Klay and Loren J. Veldhuizen, Orange City, for appellant.

Richard C. Turner, Atty. Gen., Earl W. Roberts, Jr., Asst. Atty. Gen., David Casjens, Lyon County Atty., and Walter Barbee, Dickinson County Atty., for appellee.

Heard by MOORE, C. J., and LeGRAND, UHLENHOPP, REYNOLDSON and McCORMICK, JJ.

UHLENHOPP, Justice.

This appeal involves several issues which arose in a prosecution of four murder charges. The jury could find the following from the evidence.

On the night of November 17, 1973, Sandra Cheskey, age 13, and four older teenage male companions, Roger Essem, Stewart and Dana Baade, and Michael Hadrath, went in a van to Gitchie Manitou Park in Lyon County, Iowa, where they smoked marijuana.

At that time, defendant James Ray Fryer, age 21, with an I.Q. of 85 according to a test several years before, was on work release from jail in Sioux Falls, South Dakota, in connection with a previous, unrelat-

ed conviction. Defendant got his brother, David Fryer, to telephone the jail, impersonating defendant's employer, and to report that defendant was needed for work and so would not return to jail that night.

Defendant, David Fryer, and a third brother, Allen Fryer, then went to Gitchie Manitou Park in a pickup truck. Each had a shotgun; defendant had a stolen 12-gauge pump gun. There they discovered the group of teenagers. David Fryer spied on that group and reported to his brothers that the group had marijuana. He suggested that the Fryers get it.

The Fryers, armed with their loaded shotguns, spread out and approached the other group. This was the site of the first confrontation. Defendant fired the first shot—according to him, into the air. The teenagers started to run and more shooting occurred. Although the evidence is not completely clear, evidently Allen fired two shots, killing Roger Essem and wounding Michael Hadrath, and David shot and wounded Stewart Baade.

According to defendant, after he fired the first shot he headed toward the victims' van where David joined him, but the keys were not in that vehicle so he and David went to the Fryer pickup truck.

Allen Fryer then marched Sandra Cheskey, Dana Baade, and the wounded Michael Hadrath to the pickup truck. Defendant dismounted from the truck. The wounded Stewart Baade then joined the group. This was the site of the second confrontation.

One of the teenagers then asked if they could sit. Defendant said, "Stand where you are or we will blow your __ heads off."

Dana and Stewart Baade and Michael Hadrath died from shotgun fire at this second site. After his arrest, defendant contended that before the second shooting occurred he obtained the keys to the van and drove it out of the park a short distance. He also contended he rejoined his brothers after this shooting when the engine on the van quit running. Sandra Cheskey's version, however, was somewhat different. She testified that Allen Fryer took her from the park in the pickup and as they left she observed defendant and David Fryer with their guns pointed at Michael Hadrath and the two Baade brothers.

Defendant and David Fryer left in the van; apparently it would run at that time. Thereafter they switched the van for David Fryer's car, joined Allen Fryer and Sandra Cheskey, and went to an abandoned farm where Allen had a job. At that place defendant had sexual intercourse with Sandra Cheskey; the jury could find that Allen and David did also. Subsequently Allen Fryer took Sandra Cheskey to her home in Sioux Falls.

The next day, Sandra Cheskey reported the occurrence to the Sioux Falls police. She later identified the Fryers.

After the homicides, defendant was confined to jail in Sioux Falls under the previous sentence. Iowa officers filed a preliminary information before a judicial magistrate in Lyon County, Iowa, and obtained an Iowa arrest warrant. They purported to serve the warrant on defendant in the Sioux Falls jail on November 30, 1973, and they also requested an extradition order. The same day the three Fryers waived extradition to Iowa.

Since defendant's sentence in South Dakota would not expire until January 10, 1974, the sheriff in Sioux Falls would not fully release defendant until then. Subsequent to defendant's waiver of extradition, agents of the Iowa Bureau of Criminal Investigation interviewed defendant in jail in Sioux Falls, after giving him the Miranda warning. He told them his version of the events at the park. The same day, December 4, 1973, South Dakota officers took defendant to Iowa where Iowa officers then took him before the Lyon County judicial magistrate, who appointed defense counsel. The South Dakota officers then returned defendant to jail in Sioux Falls. The next day they again brought defendant to Iowa, and the magistrate fixed bond. They then again returned defendant to the Sioux Falls jail.

On December 19, 1973, the South Dakota state's attorney requested the circuit court

there to suspend the balance of defendant's South Dakota sentence; defendant appeared but did not join in the request, and the court denied it.

On December 20, 1973, the Lyon county attorney charged defendant with murder of the four individuals who died in the park.

On December 21, 1973, defendant withdrew his waiver of extradition from South Dakota.

On January 10, 1974, Iowa officers again requested an extradition order from South Dakota, and the Sioux Falls Municipal Court set a hearing on the request for February 7, 1974. On February 6, however, defendant petitioned the South Dakota Circuit Court for a writ of habeas corpus, challenging extradition. On February 11, 1974, the circuit court held a hearing, annulled the writ, and granted extradition. Defendant thereupon appealed to the South Dakota Supreme Court. In May 1974, defendant petitioned to dismiss his appeal and again waived extradition to Iowa. On May 17, 1974, the South Dakota Supreme Court dismissed the appeal. Iowa officers thereafter brought defendant to Lyon County, the district court in Iowa arraigned him, and defendant demurred to the county attorney's information.

On June 3, 1974, defendant petitioned for and obtained a writ of habeas corpus in Lyon County; he challenged the legality of his final transfer to Iowa. One of defendant's allegations in his habeas corpus petition related to his mental condition. The State of Iowa filed a resistance to the petition. The district court set the habeas corpus case for hearing on June 17, 1974, but on that date defendant moved for and the court granted a continuance to enable defendant to take the deposition of Dr. Fernando Ramos, who had conducted a mental examination of defendant previously. Also on that date, the State applied in the criminal case to have defendant psychiatrically examined—in view of defendant's allegations in the habeas corpus case about his mental condition. The court granted the application.

On June 18, 1974, however, defendant escaped from jail in Iowa, stole a motor vehicle, and drove to Wyoming. Federal officers subsequently returned him to Iowa under a federal warrant issued in connection with a federal charge, and in July 1974 Iowa officers obtained custody of him again, under a writ of habeas corpus ad prosequendum.

Thereafter Iowa officers took defendant to the Iowa Security Medical Facility, where he remained for examination approximately 30 days. The Facility reported that defendant was competent to participate in legal proceedings and that he did not have any mental condition which would preclude accountability for illegal behavior.

Subsequently various proceedings took place in the two pending Iowa cases, the criminal prosecution and the habeas corpus case. In the latter case the State filed an amended answer averring the intervening events, Fryer filed a motion to strike, and the State filed a resistance to the motion. The heart of the habeas corpus case was whether Iowa had personal jurisdiction of Fryer so that it could prosecute him criminally, in light of illegalities which Fryer alleged had occurred in the extradition proceedings. The parties tried the habeas corpus case on the merits, and on November 29, 1974, the district court rendered judgment annulling the writ. On December 26, 1974, Fryer appealed that case, and we today affirm the judgment. In the *Matter of Fryer*, filed May 19, 1976.

After the district court annulled the writ of habeas corpus, defendant, in addition to his demurrer, moved to dismiss the information in the criminal case for denial of speedy trial and, in the alternative, for stay of the criminal action pending an appeal by defendant in the habeas corpus case. Defendant also moved for permission to take an interlocutory appeal in the criminal case, and for a change of venue.

The district court held a hearing on defendant's demurrer and motions on December 3, 1974, after which the court overruled all of them except the motion for change of venue. The court sustained that motion

and ordered trial held in Dickinson County. Defendant entered a plea of not guilty.

Trial of the criminal case began on December 11, 1974. On December 20, the jury found defendant guilty of manslaughter of Roger Essem and of first-degree murder of Michael Hadrath and the Baade brothers. The trial court pronounced sentence, and defendant appealed. In this court he presents several grounds for reversal.

I. *Speedy Trial.* Defendant's assignment regarding speedy trial contains two parts.

■■■ A. Defendant first contends the Lyon County Attorney charged him on December 20, 1973, but trial did not commence until December 11, 1974, contrary to the 60-day requirement of § 795.2, Code 1975. The question, of course, is whether good cause for the delay appears. Among the "good causes" are delays brought about by the accused. *State v. Truax*, 232 N.W.2d 861 (Iowa); *State v. King,* 225 N.W.2d 337 (Iowa); *State v. Lyles,* 225 N.W.2d 124 (Iowa).

Defendant first argues that the State of Iowa had defendant physically in Lyon County on December 3 and 4, 1973, and could have kept him and gone forward with the prosecution. The problem is that while defendant had at that time waived extradition, he was not free to stay in Iowa so far as South Dakota was concerned. His South Dakota sentence still had time to run. The willingness of the sheriff in South Dakota to let his officers bring defendant to Iowa on December 4 and 5 at all is somewhat surprising, but he evidently trusted the Iowa officers to let the South Dakota officers have defendant back after the court appearance, as indeed the Iowa officers did.

The Iowa officers had the extradition waiver, but they did not yet have a jail discharge from South Dakota. They honored the South Dakota sentence and let the South Dakota officers return defendant to that state pending expiration of the sentence there. Defendant is asking us to say the Iowa officers were wrong in honoring the South Dakota sentence and that once they got their hands on him in Iowa, they should have told the South Dakota officers to go hence without their prisoner.

We are not willing to say that. To be sure, the whole process was unusual; we would have expected the sheriff in South Dakota to retain custody of defendant until the South Dakota sentence expired. But the sheriff let his officers bring defendant across the line twice, and we are unwilling to criticize the Iowa officers for following the regular processes of the law, that is, getting an extradition waiver and then waiting for permanent transfer of defendant to Iowa until the expiration of the South Dakota sentence.

The flaw in the Iowa officers' plan, of course, was that defendant changed his mind about extradition and withdrew his waiver. But when the South Dakota sentence expired, the Iowa officers promptly applied for an extradition order. After a habeas corpus trial, the South Dakota Circuit Court granted the extradition order, but defendant appealed. When he eventually dismissed his appeal and waived extradition the second time, Iowa officers promptly brought him to this state.

Thereafter further proceedings occurred which unavoidably delayed trial. Defendant initiated habeas corpus in Iowa. He then broke jail and went to Wyoming. After Iowa officers again obtained custody of him, they took him to the security facility for mental examination. Following that procedure, the parties tried the habeas corpus case and the district court decided it. Thereafter the parties took up the criminal case again, defendant made motions, the district court held a hearing and made rulings, and that court transferred the case to another county. Trial then promptly occurred.

■■ This record does not reflect dilatory conduct by the Iowa officers. It reflects a number of steps and proceedings which add up to "good cause" for the delay in trial, within the meaning of § 795.2 of the Code.

■■ B. Defendant further contends that he was not tried within 180 days as

mandated by a provision of the Interstate Agreement on Detainers, § 759A.1, art. III, Code 1975. Among the reasons this 180-day requirement does not apply, however, is defendant's failure to trigger the running of the 180-day period by written request for final disposition of the Iowa prosecution. See *State v. Wood*, 241 N.W.2d 8 (Iowa).

Defendant's first assignment of error is not meritorious.

■ II. *Evidence of Rape.* Defendant contends the trial court erred in admitting evidence that defendant raped Sandra Cheskey at the abandoned farmstead after the homicides in the park. We think, however, that this evidence was admissible on three distinct bases.

By agreement of the parties, the trial court did not submit to the jury the theory of felony-murder—murder committed in the perpetration of rape. See Code 1975, § 690.2. But that agreement came after the evidence of the rape had been introduced, and we judge the propriety of the rape evidence in light of the posture of the case when that evidence was introduced. The State introduced evidence from which the jury could find that defendant was present and acted in concert with his brothers when they came upon the girl and boys in the park, when they killed the boys but not the girl, when they went to the abandoned farmstead, and when they had sexual intercourse with the girl there. The State had a right thus to try to show that the murders occurred in the perpetration of the rape—whether the jury ultimately would or would not so find. Compare facts in *State v. Conner*, 241 N.W.2d 447 (Iowa).

Second, the State claimed that defendant himself participated in the fatal shooting, but in the event the jury would find the fatal shots were fired by defendant's brothers the State also claimed aiding and abetting by defendant—which would also incriminate him as a principal. Code 1975, § 688.1. To strengthen its claims of personal participation or aiding and abetting, the State could show that defendant shared in the spoils of the homicides—intercourse with the girl. Defendant's participation in the rape tends to rebut his contention that he was not involved in the homicides and tends to support the State's claim that he was a party to the whole affair. See *State v. Hill*, 239 Iowa 675, 32 N.W.2d 398; 29 Am.Jur.2d Evidence § 326 at 376–378, §§ 329–330 at 378–379; 22A C.J.S. Criminal Law § 689 at 791.

■ Third, we think that excising evidence of the intercourse from the rest of the occurrences of the night would artificially bifurcate the whole incident. The case comes within the rule the State may show a continuous series of occurrences "to complete the story of the crime" although other offenses come to light in the process. McCormick, Evidence (2d ed.) § 190 at 448. See *State v. Garren*, 220 N.W.2d 898 (Iowa); *State v. Drake*, 219 N.W.2d 492 (Iowa); *State v. Lyons*, 210 N.W.2d 543 (Iowa); *State v. Cunha*, 193 N.W.2d 106, 112 (Iowa) ("The State contends the various acts of the four men were so interrelated as to make them admissible even though some of those acts were criminal in nature. On June 14, 1969 three robberies occurred at which one or more of the four men were identified. The last of the robberies, the instant case, resulted in a killing. It was necessary that the available evidence as to the activities of the four men be shown. Such actions were relevant from the time of the jail escape until the admissions and identification made at Waterloo four days later.").

Defendant's second assignment of error is not well taken.

III. *Defendant's Inculpatory Statements.* The Fryers waived extradition on November 30, 1973, but defendant remained in the Sioux Falls jail under his sentence there. At about 8:55 a. m. on December 4, 1973, Terrance Hoil, an agent of the Iowa Bureau of Criminal Investigation, began an interview of defendant at the Sioux Falls police department. The interview lasted approximately an hour. He first fully gave defendant the Miranda warning, and defendant signed a waiver. Defendant then related his version of the events of the night of November 17, 1973.

At about 10:00 o'clock that forenoon, agent Terry C. Johnson of the IBCI entered the room. He first showed defendant the signed waiver and asked defendant if he understood his rights and had any questions. Defendant said yes, he understood, and no, he had no questions. Johnson asked defendant if he was willing to have a stenographer take down his statement, and defendant responded no. But defendant said he would tell Johnson the story, which he did.

Defendant moved the district court in the present criminal prosecution to suppress his oral inculpatory statements to Hoil and Johnson. The court held a hearing and thereafter overruled the motion. Defendant objected again at trial to admission of the statements. The trial court overruled the objection and the evidence came before the jury.

In determining the admissibility of such statements we make an independent evaluation of the totality of the circumstances. *State v. Boren*, 224 N.W.2d 14 (Iowa), cert. den. 422 U.S. 1008, 95 S.Ct. 2630, 45 L.Ed.2d 671. We have done so here and agree with the trial court that the State proved by a preponderance of the evidence defendant voluntarily and intelligently made the waiver and the statements. See *State v. Conner*, 241 N.W.2d 447 (Iowa).

Defendant insists that the statements were inadmissible because officers did not immediately take him before the Lyon County magistrate under § 758.1 of the Code after he waived extradition. But "[w]e have consistently held that failure to take an accused immediately before a magistrate for an arraignment under section 758.1 does not itself render a statement taken prior thereto inadmissible." *State v. Milford*, 186 N.W.2d 590, 592 (Iowa). Rather, "In determining the voluntariness of a statement, whether it be a confession or merely an admission, each case must be determined largely on its own facts and circumstances surrounding the interrogation which led up to the statement." *State v. Hansen*, 225 N.W.2d 343, 350 (Iowa). The facts and circumstances disclosed by this record demonstrate that defendant voluntarily made the oral statements.

We do not find merit in this assignment of error.

IV. *Photographs.* Over defendant's objection, the State introduced into evidence photographs of the victims' bodies, showing their wounds. Defendant contends the pictures were inflammatory and prejudicial, and unnecessary since the fact of the death of the victims by shooting was not in issue.

Trial courts have considerable discretion as to the admission of photographs of homicide victims. *State v. Hummell*, 228 N.W.2d 77 (Iowa); *State v. Albers*, 174 N.W.2d 649 (Iowa). Photographs in murder cases are frequently grisly because murder is grisly business. *State v. Lass*, 228 N.W.2d 758 (Iowa). That facts depicted by photographs are not contested does not necessarily render them inadmissible. *State v. Campbell*, 210 Kan. 265, 500 P.2d 21; *State v. Hokenson*, 96 Idaho 283, 527 P.2d 487; *Hawkins v. State*, 219 Ind. 116, 37 N.E.2d 79; *State v. Greene*, 74 R.I. 437, 60 A.2d 711; *State v. Lantzer*, 55 Wyo. 230, 99 P.2d 73.

The trial court did not abuse its discretion by admitting the photographs.

V. *Argument of Prosecutor.* Defendant contends the prosecutor was guilty of misconduct in jury argument. Trial courts have considerable discretion in ruling on contentions in this area. *State v. Lyons*, 210 N.W.2d 543 (Iowa); *State v. Vickroy*, 205 N.W.2d 748 (Iowa). In addition, "In jury arguments counsel is entitled to some latitude in analyzing the evidence admitted in the trial, and he may draw conclusions and point out permissible inferences and weaknesses in . . . testimony." *State v. Wesson*, 260 Iowa 331, 340, 149 N.W.2d 190, 196.

Defendant's first two objections relate to arguments concerning the rape and the photographs. We have already held, however, that these matters were properly in evidence, and argument concerning them was within the record. Defendant also ob-

jects that the prosecutor argued the felony-murder rule, whereas the trial court did not submit felony-murder to the jury. We have examined the prosecutor's words to which defendant objects, but they do not appear to deal with felony-murder. Finally defendant objects that one of the arguments by the prosecutor amounted to commenting on defendant's failure to testify. The State counters that the argument was fairly responsive to an argument by defense counsel. We do not resolve this dispute, however, as defendant did not advance his objection in the trial court and his point presents nothing for review. *State v. Dahlstrom*, 224 N.W.2d 443 (Iowa).

We reject this assignment of error.

VI. *Sufficiency of Evidence.* Defendant moved the trial court for a directed verdict at the close of the evidence, but the court overruled the motion. Defendant contends the evidence was insufficient to support submission of first degree murder by defendant. The rule is, of course, that on a defense motion for directed verdict, "we consider the evidence in the light most favorable to the State and accept all reasonable inferences tending to support the verdict." *State v. Sellers*, 215 N.W.2d 231 (Iowa). The State did not have to prove that defendant himself fired the rounds which killed the victims if the jury could reasonably infer from the evidence that defendant assented to those acts or lent countenance or approval either by active participation in them or by some manner encouraging them prior to or at the time of their commission. *State v. Miller*, 259 Iowa 188, 142 N.W.2d 394.

Defendant does not question the sufficiency of the evidence of corpus delicti, nor could he successfully do so. The issue relates to defendant's connection with the homicides. On this issue the State introduced evidence damaging to defendant that the three brothers acted in concert. The three were initially together in the pickup truck. Each was armed—including defendant himself. Bearing their loaded guns, the three advanced upon the teenagers in the park. Defendant shot first. The State's

evidence thus placed defendant at the first confrontation. The group gathered again near the park entrance—the three brothers and the four survivors of the first confrontation; the State thus placed defendant at the second confrontation. After the second homicides, defendant does not leave in the Fryer pickup; he obtains the keys to the vehicle of the other group and departs in that car. He participates in the concluding chapter of the enterprise by having sexual intercourse with the sole member of the other group who is permitted to survive—the female. True, defendant contends he removed himself from the confrontations in each instance before the homicides occurred, but in view of the State's evidence the jury was not required to accept this version. *State v. Hall*, 203 N.W.2d 375 (Iowa). We hold that the evidence amply supported submission to the jury of the murder charges against defendant. *State v. Miller*, 259 Iowa 188, 142 N.W.2d 394; *State v. King*, 198 Iowa 325, 197 N.W. 981.

Defendant's assignment of error is without merit.

Defendant contends in a separate assignment that the trial court erroneously admitted certain demonstrative evidence into the record, but he cites no authority in support of this assignment and we do not consider it. *State v. Mattingly*, 220 N.W.2d 865 (Iowa).

Our examination of the record convinces us that defendant received a fair trial.

AFFIRMED.

All Justices concur except McCORMICK, J., who concurs specially.

McCORMICK, Justice (concurring specially).

Although I concur in the court's opinion, I believe something more needs to be said about admission of the photographs of the homicide victims discussed in Division IV.

Our continued failure to delineate the principle by which trial court discretion is to be exercised in admitting such photographs may lead to problems for prosecu-

tors and trial judges which could otherwise be avoided.

Relevant evidence is not admissible without regard to its effects on the emotions of jurors. We have repeatedly said evidence, although relevant, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *State v. Harmon*, 238 N.W.2d 139, 144–145 (Iowa 1976), and citations. Photographs of homicide victims are not exempt from this principle.

In the present case, the photographs were not only relevant in showing the fact, cause, and location of death, all of which defendant admitted. Several black and white photographs showed the bodies where they were found in the park. They illuminated the testimony of Sandra Cheskey and the testimony of others who saw the bodies there. The remainder of the photographs were color pictures of the nude bodies of the victims in the morgue showing the extent and nature of the wounds. These photographs tended to confirm Sandra Cheskey's testimony regarding the manner, sequence of events, and circumstances in which the wounds were inflicted. Although the photographs would inevitable affect the emotions of jurors, they had more than minimal relevancy.

Since I do not believe we can say as a matter of law that the probative value of the photographs was substantially outweighed by the danger of unfair prejudice, I join the majority holding that the trial court rulings admitting them were not an abuse of discretion.